SCHMIDT PRITCHARD & CO., Mangano Cycles Co.

v.

UNITED STATES.

C. D. 2029; Protest No. 298220-K.

United States Customs Court,
Second Division.
Oct. 6, 1958.

Barnes, Richardson & Colburn, New York City (J. Bradley Colburn, New York City, of counsel), for plaintiffs.

George Cochran Doub, Asst. Atty. Gen. (Richard E. FitzGibbon, Trial Atty.) New York City, for defendant.

Lamb & Lerch, New York City (David A. Golden and John G. Lerch, New York City, of counsel), as amicus curiæ.

Before LAWRENCE, RAO, and FORD, Judges.

LAWRENCE, Judge.

This cause of action presents a problem of far-reaching importance.

Plaintiffs challenge the legality of a proclamation of the President of the United States which modified the rate of duty upon certain imported bicycles. The case naturally has a direct impact not only upon our domestic economy, but upon international trade as well, to the extent that both are affected by the dutiable status of a commodity which is the subject of extensive importation, manufacture, and trade.

The jurisdiction of the court has been invoked by protest filed by the plaintiffs, pursuant to the provisions of section 514 of the Tariff Act of 1930 (19 U.S.C.A. § 1514), objecting to the dutiable classification by the collector of customs of an importation of bicycles.

The shipment was classified in paragraph 371 of the Tariff Act of 1930 (19

U.S.C.A. § 1001, par. 371), as modified by proclamation of the President, 90 Treas. Dec. 285, T.D. 53883, pursuant to section 7(c), Trade Agreements Extension Act of 1951, as amended (19 U.S.C.A. § 1364, 86 Treas. Dec. 277, T.D. 52772, 88 Treas. Dec. 209, T.D. 53326, and 90 Treas. Dec. 185, T.D. 53833), and duty was imposed thereon at the rate of 11¼ per centum ad valorem.

Plaintiffs assert that said proclamation of the President is illegal, null, and void for failure of the Tariff Commission and the President to comply with the specific requirements of the Trade Agreements Extension Act. If successful upon his count, then it is claimed by the plaintiffs that the bicycles in controversy are properly dutiable at 7½ per centum ad valorem, in said paragraph 371, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802.

### Trade Agreements Extension Act of 1951, as Amended Operation of Escape Clause

The relevant portions of section 7 of the Trade Agreements Extension Act of 1951, as amended, are here set forth:

[Investigation by Commission]

"Sec. 7. (a) Upon the request of the President, upon resolution of either House of Congress, upon resolution of either the Committee on Finance of the Senate or the Committee on Ways and Means of the House of Representatives, upon its own motion, or upon application of any interested party, the United States Tariff Commission shall promptly make an investigation and make a report thereon not later than nine months after the application is made to determine whether any product upon which a concession has been granted under a trade agreement is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported into the United States in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products.

[Tariff Commission hearings]

"In the course of any such investigation, whenever it finds evidence of serious injury or threat of serious injury or whenever so directed by resolution of either the Committee on Finance of the Senate or the Committee on Ways and Means of the House of Representatives, the Tariff Commission shall hold hearings giving reasonable public notice thereof and shall afford reasonable opportunity for interested parties to be present, to produce evidence, and to be heard at such hearings.

[Recommendation to President]

"Should the Tariff Commission find, as the result of its investigation and hearings, that a product on which a concession has been granted is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products, it shall recommend to the President the withdrawal or modification of the concession, its suspension in whole or in part, or the establishment of import quotas, to the extent and for the time necessary to prevent or remedy such injury. The Tariff Commission shall immediately make public its findings and recommendations to the President, including any dissenting or separate findings and recommendations, and shall cause a summary thereof to be published in the Federal Register.

[Factors for consideration]

"(b) In arriving at a determination in the foregoing procedure the Tariff Commission, without excluding other factors, shall take into consideration a downward trend of

production, employment, prices, profits, or wages in the domestic industry concerned, or a decline in sales, an increase in imports, either actual or relative to domestic production, a higher or growing inventory, or a decline in the proportion of the domestic market supplied by domestic producers. Increased imports, either actual or relative, shall be considered as the cause or threat of serious injury to the domestic industry producing like or directly competitive products when the Commission finds that such increased imports have contributed substantially towards causing or threatening serious injury to such industry.

[Modifications by President]

"(c) Upon receipt of the Tariff Commission's report of its investigation and hearings, the President may make such adjustments in the rates of duty, impose such quotas, or make such other modifications as are found and reported by the Commission to be necessary to prevent or remedy serious injury to the respective domestic industry. If the President does not take such action within sixty days he shall immediately submit a report to the Committee on Ways and Means of the House and to the Committee on Finance of the Senate stating why he has not made such adjustments or modifications, or imposed such quotas.

[Publication of Commission's report]

"(d) When in the judgment of the Tariff Commission no sufficient reason exists for a recommendation to the President that a concession should be withdrawn or modified or a quota established, it shall make and publish a report stating its findings and conclusions.

[Definitions]

"(e) As used in this Act, the terms 'domestic industry producing like or directly competitive products' and 'domestic industry producing like or directly competitive articles'

mean that portion or subdivision of the producing organizations manufacturing, assembling, processing, extracting, growing, or otherwise producing like or directly competitive products or articles in commercial quantities. In applying the preceding sentence, the Commission shall (so far as practicable) distinguish or separate the operations of the producing organizations involving the like or directly competitive products or articles referred to in such sentence from the operations of such organizations involving other products or articles."

### The Record

At the trial, a stipulation entered into by adversary counsel was received in evidence as exhibit 1, together with a certified statement (collective exhibit 2) of the Secretary of the Tariff Commission as to the official records of the Commission pertaining to its Investigation No. 37 with respect to bicycles, including copies of official notices, and reports and statements in connection with the Commission's investigation and Presidential action.

The following undisputed facts are established by the record:

1. On June 14, 1954, an application was filed with the Tariff Commission for an investigation of bicycles under section 7, Trade Agreements Extension Act of 1951, as amended. Exhibit 1.

2. On June 22, 1954, the Tariff Commission, by order of Investigation No. 37, instituted an investigation under said section 7, with respect to bicycles. Exhibits 1, 2–A. Due notice of such investigation was given.

3. On July 8, 1954, the Tariff Commission ordered a public hearing to be held in said Investigation No. 37 on September 21, 1954. Exhibits 1, 2–B. Due notice of such hearing was given.

4. On September 21–24, inclusive, 1954, and September 27, 1954, a pub-

lic hearing was held by the Commission pursuant to said notice. Exhibits 1, 2.

5. On March 14, 1955, the Tariff Commission submitted a report to the President on its said Investigation No. 37 on bicycles. Exhibits 1, 2, 3.

6. On May 11, 1955, the President addressed a letter to the chairman of the Tariff Commission requesting further information and report back to him no later than July 15, 1955. Exhibits 1, 2–C.

7. On May 11, 1955, the President addressed a letter to the Chairman of the Committee on Ways and Means, House of Representatives, and Committee on Finance, Senate, advising them he was remanding the case to the Commission for further information.

8. On July 14, 1955, the Tariff Commission submitted a supplemental report to the President on its said Investigation No. 37 with respect to bicycles. Exhibit 4. No public notice was issued and no public hearing was held in connection with said report. Collective exhibit 2.

9. On August 18, 1955, the President issued a proclamation increasing the rates of duty on bicycles. Proclamation No. 3108 U.S.Code Congressional and Administrative News 1955, p. 1024. Exhibit 5. The increased rates so proclaimed differed in part from the rates found and recommended by the Tariff Commission to the President. Tariff Commission findings and recommendations, exhibit 3, pages 4, 5.

10. On August 18, 1955, coincident with the issuance of said proclamation, the President addressed a letter to the Chairman of the Committee on Finance, United States Senate, and the Chairman of the Committee on Ways and Means, House of Representatives, setting forth reasons for his action in promulgating rates of duty different from those found and recommended by the majority of the Commission. Exhibit 5.

11. On August 19, 1955, the Tariff Commission issued a statement reporting the action of the President, and the reasons stated by him for his action. Collective exhibit 2–D.

■ The contending parties are agreed that the court has full authority to examine the proceedings before the Tariff Commission and the President to determine whether they have properly exercised the power delegated to them by the Congress in the Trade Agreements Extension Act, as amended, *supra*. That the issues raised by plaintiffs are justiciable is scarcely open to question. J. W. Hampton, Jr., & Company v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624, and United States v. George S. Bush & Co., Inc., 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259, and cases cited.

Plaintiffs assail the legality of the proclamation of the President on the following grounds:

1. The proclamation of the President is invalid because based upon an illegal investigation and report by the Tariff Commission.

(a) The 13-month period required for said investigation and report, including the supplemental inquiry and report, exhibit 4, exceeded the express statutory limitation of nine months from date of application in which such an investigation and report is required to be completed.

(b) No public notice was given of, and no hearing was held in the course of the supplemental inquiry forming the basis of the Commission's supplemental report.

2. The proclamation of the President is illegal, null, and void for the further reason that said proclamation was not made within the express statutory limitation of 60 days following receipt of the Tariff Commission's first report.

3. The proclamation is invalid for the further reason that the President attempted therein to make effective a rate of duty not found and recommended to him by the Tariff Commission in violation of the express mandate of law limiting his discretion to acceptance or rejection of the findings and recommendations of the Tariff Commission.

4. The proclamation is invalid for the final reason that it is based on a finding by the President that products covered thereby are not like or directly competitive with the American product in violation of the express limitation of law restricting changes in duties to "like or directly competitive" products.

■■■ The first two problems above presented by plaintiffs are so closely related that they may well be combined for purposes of this discussion.

Section 1364(a) of the statute, above quoted, specifically commands the Tariff Commission to conduct its investigation "promptly" and make a report thereon "not later than nine months after the application is made" to the Commission to make an investigation. This is emphasized by the fact that the original provision of the statute contained no limitation of time. The Congress subsequently limited the period within which a report should be made to 1 year, which, however, later was abbreviated to 9 months to insure greater celerity in said investigation and report of the Commission.

The stipulation of the parties discloses that the Tariff Commission did comply with this requirement in the first instance by completing its investigation and report within the 9-month period.

Section 7(c) of said extension act provides that upon the receipt of the Tariff Commission's report "the President may make *such* adjustments *in the rates of duty,* impose such quotas, or make such other modifications as are *found and reported by the Commission* to be necessary to prevent or remedy serious injury to the respective domestic industry." Said section 7(c) further provides that "if the President does not take such action *within sixty days,*" he shall promptly notify the Committee on Ways and Means of the House and the Committee on Finance of the Senate why he has not "made *such* adjustments or modifications, or imposed such quotas." In this connection, it will be noted that the Commission submitted a report of its investigation to the President March 14, 1955, and, on May 11, 1955 (which was within the 60-day period), the President addressed the House and Senate committees, above referred to, advising them that he was remanding the case to the Commission for further information.

On July 14, 1955, which was 4 months subsequent to the date of its original report to the President, the Commission submitted a supplemental report upon the matter in controversy and, on August 18, 1955, the President issued a proclamation increasing the rates of duty on bicycles from $7\frac{1}{2}$ per centum ad valorem to $11\frac{1}{4}$ per centum ad valorem, although the Commission had recommended an increase equivalent to a rate of duty of not less than $22\frac{1}{2}$ per centum nor more than 30 per centum ad valorem.

At this point, it is urged by plaintiffs that since the full 9-month period permitted by law had expired on the date (March 14, 1955) of the Commission's initial report, its subsequent report on July 14, 1955, exceeded the statutory limitation by 4 months, and, consequently, that the report of the Tariff Commission was invalid and, by the same token, the proclamation of the President based thereon must fall.

■ That Congress clearly intended to place a time limit on the investigation of the Tariff Commission is made clear by reference to the congressional history of the Trade Agreements Extension Act of 1953 (Public Law 215, approved August 7, 1953, 67 Stat. 472, 88 Treas. Dec. 209, T. D. 53326. See Report, Committee on Finance, Senate Report No. 472, 83d Congress, 1st sess., p. 1, and explanatory statement of the senator in charge of

the bill on the floor of the Senate, Senate proceedings, July 2, 1953, p. 8105). The amendment, which was adopted in 1953, was reenacted in the extension act of 1955 (Public Law No. 86, approved June 21, 1955, 69 Stat. 162, 90 Treas. Dec. 185, T. D. 53833).

Plaintiffs do not question the right or authority of the President to direct a further inquiry, as he did on May 11, 1955; or even to order a new or supplemental investigation, but contend, nevertheless, that the President was powerless to disregard the jurisdictional requirements of the statute which provide that the Tariff Commission shall give public notice of any such investigation and if, in the course of any such investigation, the Commission finds evidence of serious injury, it shall "hold hearings giving reasonable public notice thereof and shall afford reasonable opportunity for interested parties to be present, to produce evidence, and to be heard at such hearings." Sec. 7(a), Trade Agreements Extension Act, *supra.*

That no notice was given by the Tariff Commission of the supplementary inquiry and that no hearings were held is established by collective exhibit 2. Therefore, if it be contended that the Commission's supplemental inquiry and report constituted a new investigation, then obviously such supplementary proceedings were illegal for lack of public notice and public hearings.

On the other hand, if it be urged that all of the proceedings before the Tariff Commission, including its report of March 14, 1955, and its supplementary report of July 14, 1955, constituted but one investigation, then it necessarily follows that the final report of the Commission was not submitted to the President until 13 months after the filing of the application in violation of the statute and was, therefore, invalid.[1]

### President's Request for Further Information

The wide field of inquiry in the President's request for further information after he reviewed the Tariff Commission's report may be gathered from the President's letter, under date of May 11, 1955, addressed to the Chairman of the Tariff Commission (collective exhibit 2–C), indicating as follows:

(1) Additional data extending as far as possible into 1955 (the Commission's findings and recommendations did not extend beyond the end of 1954). That information was requested in order to "gain a clearer idea as to whether the decline in domestic bicycle production in 1954 was the beginning of a persistent trend or only a temporary variation such as the Commission's report indicates the industry has experienced in the past."

It was further requested that the Commission give its "considered judgment" as to the industry's prospects for the remainder of the year and, in that connection, it was important to know whether the American bicycle industry had been able to share in the rising level of economic activity which the United States was enjoying at that time.

(2) For purposes of comparison, the most recent import figures were deemed necessary and the Commission was asked to give its estimate for the remainder of the year.

---

1. It is of interest to note that on certain occasions since the trial of this case where the initial recommendation of the Commission has not been acted upon by the President within the 60-day period following receipt of the report, a subsequent investigation has been officially noticed (See Investigation No. 61, completed January 10, 1958, stainless steel table flatware, Investigations Under the "Escape Clause" of Trade Agreements, United States Tariff Commission, Ninth Edition, February 1958, p. 41, and 93 Treas. Dec. —, Adv. Sheets, March 27, 1958, p. 65).

Also Investigation No. 62, completed January 14, 1958, umbrella frames, recommendation of the Commission not acted upon within the 60-day period but subsequent investigation by Tariff Commission initiated, (Tariff Commission Report of Investigations, supra, and 93 Treas. Dec. —, Adv. Sheets, March 27, 1958, p. 65, and 93 Treas. Dec. —, Adv. Sheets, April 10, 1958, p. 44).

(3) The opinion of the Commission as of the extent to which anticipation of the decision in this case may have influenced the volume of imports that has been entered; also, the status of inventories for the first part of 1955 of imported bicycles in the hands of dealers and importers and comparable figures for the preceding 5 years, broken down, if possible, by types of bicycles.

Similar comparative data for inventories of domestically produced bicycles, if they were available.

(4) A comparison which would show for the last 5 years and for the first part of 1955, quantities and unit prices of imports and domestic production of each major type of bicycle, lightweight or balloon tire, in each standard size.

(5) Report of the causes underlying the shift in consumer demand in the United States from balloon tire to lightweight bicycles and many factors entering into these underlying causes, including the prospective effects of technological changes now underway in the domestic bicycle industry, including the development of the medium weight type bicycles and new types of variable gears.

Obviously, the scope of inquiry requested of the Commission both in economic research and in point of time exceeded the scope of the original inquiry and the facts which were set forth in the March 14, 1955, report of the Tariff Commission, and should necessitate renewal of the statutory requirements for appropriate proceedings by the Tariff Commission.

The requirements of an investigation were not met by the action of the Commission, and it is not sufficient that the Tariff Commission, in its efforts to secure the information that was requested, sent questionnaires to most of the domestic importers and manufacturers of bicycles and that members of the Commission's staff visited nearly all of the recipients of the questionnaires and many of the large retail bicycle dealers. (Exhibit 4). That was far short of the public notice and the conduct of hearings required by the statute in pursuance of an investigation. Consequently, there was failure on the part of the Tariff Commission to comply with the external requirements of the statute.

We turn now to the contention of plaintiffs that the proclamation herein is invalid for the reason that the President proclaimed a rate of duty which was not found and recommended by the Tariff Commission and consequently violated the mandate of the statute which in substance required him to either accept or reject the findings and recommendations of the Commission.

It is settled law that when the statute prescribes a formula or outlines a pattern to be followed by a fact-finding agency in the performance of its functions, it is not permissible to adopt a different procedure. Carl Zeiss, Inc., v. United States, 76 F.2d 412, 23 C.C.P.A., Customs, 7 T. D. 47654. It was there held that public notice of an investigation by the Tariff Commission of optical instruments of a class or type used by the Army, Navy, or their respective Air Forces, for fire control, did not suggest to interested parties the holding of an investigation relative to optical instruments suitable to be used by such Armed Forces. As a result of this irregularity of the proceedings, the proclamation of the President based thereon was illegal and void.

It is of historic significance and importance that when Congress has intended to endow the Chief Executive with power and authority to exercise independent judgment designed to modify the tariff structure it has done so in clear and explicit terms. This is illustrated by the following citations:

Section 3 of the Tariff Act of 1890 (26 Stat. 612) provided that if certain contingencies were found to exist *to the satisfaction of the President,* he had the power to suspend by proclamation the application of the free list to certain commodities. Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294.

By section 315 of the Tariff Act of 1922 (42 Stat. 858), the "flexible tariff"

provision of that act, the President was constituted a fact-finding agency of the legislative branch of the Government, and the Tariff Commission was the agency designated by Congress to make investigations to assist the President in ascertaining certain factual matters for the information of the President. However, under that statute, the President was endowed with final authority to raise or lower rates of duty.

Section 315(a) provided that whenever the President, upon investigation of the differences in costs of production of certain articles of foreign and of domestic growth, shall find it thereby shown that the duties fixed in the tariff act did not equalize said differences, he was authorized to proclaim changes in classifications or increases or decreases in rates of duty. Investigations to assist the President were made by the United States Tariff Commission.

Section 316 of the Tariff Act of 1922, *supra,* provided that the President might declare unlawful certain unfair methods of competition and unfair acts in the importation of merchandise into the United States; that to assist the President the Tariff Commission was authorized to investigate alleged violations of the law and "whenever the existence of any such unfair method or act shall be established *to the satisfaction of the President,*" he was empowered to determine a rate of duty which would offset such method or act.

A close analogy to the provision in section 7(c) of the Trade Agreements Extension Act is found in the authority delegated to the President in the flexible tariff provisions of section 336(c) of the Tariff Act of 1930 (46 Stat. 390, 19 U.S.C.A. § 1336), which provided not only that the Tariff Commission should conduct investigations and report its findings to the President but it further directed that "The President shall by proclamation *approve* the rates of duty and changes in classification and in basis of value specified in any report of the commission under this section, *if in his judgment* such rates of duty and changes are shown by such investigation of the commission to be necessary to equalize such differences in costs of production." [Emphasis added.] Obviously, under that statute, the President had but one alternative—either to accept or reject the recommendation of the Commission as his judgment might dictate.

In Feltex Corp. (United States Impleaded) v. Dutchess Hat Works, 21 C.C. P.A., Customs, 463, T. D. 46957, the court, in reviewing the validity of the Presidential proclamation issued pursuant to said section 336, stated in part:

> "* * * It is our opinion that it was the intention of Congress that the President should consider all the relevant facts before the commission in its investigation in arriving at his judgment, and that, in arriving at such judgment, he is not confined to a consideration of the report of the commission other than that *he must approve or disapprove* the rates specified by the commission in its report." [Emphasis added.]

To the same effect, see United States v. Best & Co., Inc., Bonwit Teller & Co., 24 C.C.P.A., Customs, 220, T.D. 48667.

Section 337 of the act of 1930, *supra,* 19 U.S.C.A. § 1337, relating to unfair methods of competition and unfair acts in the importation of merchandise into the United States, corresponding with section 316 of the act of 1922, *supra,* likewise invested the President with power to exclude merchandise from entry into the United States after an investigation by the Tariff Commission.

The Trade Agreements Act, approved June 12, 1934 (Public Law No. 316, 73d Congress, 48 Stat. 943), designed for the "Promotion of Foreign Trade," contained the following provision:

> "* * * the President, *whenever he finds as a fact* that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States * * * is authorized from time to time—

\*   \*   \*   \*   \*   \*

"(2) To proclaim such modifications of existing duties and other import restrictions, \* \* \* as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. \* \* \*" [Emphasis added.]

It will be observed that this act confers upon the President full authority to act "whenever he finds as a fact" that the conditions prevail which justify the issuance of a proclamation regulating the status of imported merchandise, the only qualification being that before concluding any foreign trade agreement with any foreign Government pursuant to this act, reasonable public notice shall be given "of the intention to negotiate an agreement with such government \* \* \* in order that any interested person may have an opportunity to present his views to the President, or to such agency as the President may designate \* \* \*"; and, furthermore, that "before concluding such agreement the President shall seek information and advice with respect thereto from the United States Tariff Commission, the Departments of State, Agriculture, and Commerce and from such other sources as he may deem appropriate."

Section 7 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C.A. § 1364), sets forth the procedure to be followed in the operation of the escape clause of that act. There, again, before the President may issue a proclamation, the Tariff Commission shall make an investigation and report thereon not later than 9 months after the application for an investigation is made.

Section 7(c) of that act provides that:

"(c) Upon receipt of the Tariff Commission's report of its investigation and hearings, the President may make such adjustment in the rates of duty, impose such quotas, or make such other modifications as are found and reported by the Commis-sion to be necessary to prevent or remedy serious injury to the respective domestic industry. If the President does not *take such action within sixty days* he shall immediately submit a report to the Committee on Ways and Means of the House and to the Committee on Finance of the Senate stating why he has not made such adjustments or modifications, or imposed such quotas." [Emphasis added.]

Bearing in mind that the Tariff Commission's report recommended an increase from the then-prevailing rate of duty of 7½ per centum ad valorem, as follows: "Bicycles with or without tires, having wheels in diameter (measured to the outer circumference of the tire): Over 25 inches, a rate of $3.75 each, but not less than 22½ percent nor more than 30 percent ad valorem; over 19 but not over 25 inches, a rate of $3 each, but not less than 22½ percent nor more than 30 percent ad valorem; not over 19 inches, a rate of $1.87½ each, but not less than 22½ percent nor more than 30 percent ad valorem," its recommendation was limited to "such adjustments in the *rates of duty*" (nothing was said about quotas or other modifications).

Although expressed in different terms, the substance of said section 7(c) is, in effect, as stated above, analogous to the terms of section 336(c) of the Tariff Act of 1930, *supra*, which directed the President, by proclamation, to "*approve* the rates of duty \* \* \* specified in any report of the commission \* \* \* *if in his judgment*" such changes were necessary. [Emphasis added.]

It seems clear from the language of section 7(c) of the extension act, *supra*, that "*such* adjustments in the rates of duty" which the President may make are the *such* adjustments as were found and reported by the Tariff Commission and, if the President does not take *such action* within 60 days, he shall immediately report to the Committee on Ways and Means of the House and the Committee on Finance of the Senate, stating why he has not made "*such* adjustments."

282

Further evidence of the intent of Congress to limit the discretion of the President to an acceptance or rejection of the findings and recommendations of the Tariff Commission, as provided in said section 7(c), is clearly indicated in what are known as the "peril point" provisions of section 3 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C.A. §§ 1360, 1361), as well as in the so-called "national security" provisions of section 2 of said act, as amended by the Trade Agreements Extension Act of 1955 (19 U.S.C.A. § 1352a).

Said section 3, *supra*, provides that prior to entering into negotiations for trade agreements pursuant to section 350 of the Tariff Act of 1930 (19 U.S.C.A. § 1351), the President shall supply the Tariff Commission with a list of all articles to be considered for possible modification of duties under such agreement. The Commission is required to make an investigation and report to the President its findings as to which modification in duty upon such articles may be made without causing injury to a domestic industry; or whether an increase in duty or other import restriction is required to avoid injury. Although the President may not act until the Commission shall have made its report on the so-called "peril points," the statute further provides, however, in section 4 (19 U.S.C.A. § 1361) that within 30 days after any trade agreement, under section 350 (19 U.S.C.A. § 1351), has been entered into which will require or make appropriate any modification of duties exceeding the limit found and reported by the Tariff Commission, or fail to require or make appropriate the minimum increase in duty reported by the Commission as required to avoid such injury, the President shall report the circumstances to the Congress stating why he has not complied with certain requirements and his reasons for the action taken. It is obvious, therefore, that, in this instance, Congress has given express authority to the President to disregard or

exceed the peril point findings of the Commission.

The "national security" amendment to the act (sec. 2, *supra)* declares that no action shall be taken in pursuance to the trade agreement statute, section 350 (19 U.S.C.A. § 1351), to decrease the duty on any article if the President finds such reduction would threaten domestic production needed for projected national defense requirements. The statute further provides that whenever the Director of the Office of Defense Mobilization has reason to believe that any article is being imported into the United States in such quantities as to threaten to impair national security, he shall so advise the President who may cause an immediate investigation to be made to determine the facts. If, on the basis of such investigation and report, the President finds that the article is being imported into the United States in such quantities as to threaten to impair national security, he "shall take such action as he deems necessary to adjust the imports of such article to a level that will not threaten to impair the national security." 19 U.S. C.A. § 1352a.

■ The foregoing considerations based upon references to statutes in *pari materia* lead inescapably to the conclusion that section 7(c) of the extension act, *supra*, in terms directs the President to make the adjustments or modifications found and reported *by the Tariff Commission,* or to reject them.

Had it been the intention of Congress that the President could modify the rates of duty to the extent *he* saw fit, it would have been a simple matter for Congress to phrase the language of said section 7 (c) to read, so far as pertinent here, in substance as follows, appropriate language being stressed:

"(c) Upon receipt of the Tariff Commission's report of its investigation and hearings, the President may make such adjustments in the rates of duty, * * * as are found *by him* to be necessary to prevent or

remedy serious injury to the respective domestic industry."

but this the Congress did not do and we are not, of course, concerned with the wisdom or unwisdom of the congressional policy.

Defendant, in its brief, contends that the legislative history of section 7 of the Trade Agreements Extension Act of 1951, as amended, indicates that Congress contemplated that the President should request the Tariff Commission for further information upon any matter under investigation after the report is filed and that he should act upon such further information. Upon this point, reference is made to United States Code Congressional and Administrative News, 1955, page 2071, House Report No. 50, 84th Congress, 1st session, from which the following is quoted (page 2074):

> "The committee believes that the President should give full consideration to the Tariff Commission's findings regarding injury. If he believes that these findings should be further developed, or if new information relevant to such findings are disclosed, in the committee's opinion he should continue his practice of submitting such data to the Tariff Commission for supplemental investigation and findings where appropriate. * * *"

As pointed out earlier in this opinion, that is precisely what was done in respect to Investigations No. 61 and No. 62. The matter quoted above is followed with the statement:

> "* * * Your committee believes that the President should not be compelled as a matter of law to accept findings of the Tariff Commission where it is his opinion that they are not soundly based, although in the committee's opinion he should give full consideration and proper weight to such findings."

We find nothing in that statement inconsistent with the views expressed herein. Nowhere is it asserted that the President should accept findings of the Commission if in his opinion they are not soundly based. The point is, as indicated above, that if the President does not accept the findings of the Commission, he should reject them, not compromise them.

In view of the foregoing conclusions, we deem it unnecessary here to reach the further contention of plaintiffs that the proclamation is invalid for the reason that it is based on a finding by the President that the products covered thereby are not like or directly competitive with the American product in violation of the express limitation of law restricting changes in duties to "like or directly competitive" products.

Upon the facts of record and for the foregoing reasons, we are constrained to hold that the jurisdictional infirmities and irregularities inherent in the proceedings incident to the proclamation in controversy compel the conclusion that the validity of the proclamation cannot be upheld.

It logically follows, therefore, that the importation of bicycles herein is properly dutiable at 7½ per centum ad valorem in paragraph 371 of the Tariff Act of 1930, as modified, *supra,* as claimed by plaintiffs.

Judgment will issue accordingly.

FORD, Judge.

I concur with my colleagues in the decision and judgment rendered herein except with respect to the limitation of authority of the President to "accept or reject" the findings of the Tariff Commission.

The President, in the matter now pending before the court, accepted the findings but did not accept *in toto* the recommendations of the Tariff Commission, which were as follows:

"Findings of the Commission

"On the basis of its investigation, including the hearing, the Tariff Commission finds as follows:

"(1) As a result in part of the duties reflecting concessions granted thereon in the General Agreement on Tariffs and Trade, bicycles provided for in paragraph

371 of the Tariff Act of 1930, and described in item 371 (First) in Part I of Geneva-Schedule XX annexed to the General Agreement, are being imported into the United States in such increased quantities, both actual and relative, as to cause serious injury to the domestic industry producing like or directly competitive products.

"(2) The application, for an indefinite period, of the following rates of duty to imports of such bicycles, is necessary to remedy the serious injury to the domestic industry producing like or directly competitive products: Bicycles with or without tires, having wheels in diameter (measured to the outer circumference of the tire): Over 25 inches, a rate of $3.75 each, but not less than 22½ percent nor more than 30 percent ad valorem; over 19 but not over 25 inches, a rate of $3 each, but not less than 22½ percent nor more than 30 percent ad valorem; not over 19 inches, a rate of $1.87½ each, but not less than 22½ percent nor more than 30 percent ad valorem. (Pages 4–5 of ex. 3—United States Tariff Commission, Bicycles, Report to the President on Escape-Clause Investigation No. 37, Under the Provisions of Section 7 of the Trade Agreements Extension Act of 1951, Washington, March 1955.)"

On August 18, 1955, coincident with the issuance of his proclamation, the President set forth his reasons for the modification in a letter addressed to the chairman of the Committee on Finance of the United States Senate and the Committee on Ways and Means of the House of Representatives, pursuant to section 7 of the Trade Agreements Extension Act of 1951, as amended, 19 U.S.C.A. § 1364(c). In doing so, the President presented his reasons for the modification, pertinent parts of which are as follows:

"In 'escape clause' cases such as this, several issues of a fundamental kind are involved.

"There is the question of injury and relief to a domestic industry within the meaning of the law.

"There is the question of our national security interest in the economic strength of valued allies in the free world.

"There is the question of building export markets for the products of our farms, factories and mines.

"There is the question of compensation under our trade agreement commitments to nations affected by the withdrawal of certain tariff concessions previously granted by us.

"There is the question of protecting the American consumer against unnecessary and unjustified price increases.

"The Tariff Commission has the responsibility with respect to the first of these questions: to investigate and report to the President any finding of serious injury or threat of serious injury within the meaning of the law.

"The President has the responsibility of considering, not only the question of injury to a domestic industry and measures recommended for its relief, but also the other fundamental questions bearing on the security and well-being of 165,000,000 Americans. The President's final judgment in each case must represent the best composite evaluation he can make of these questions.

"In analyzing this case I have considered not only the Tariff Commission's two reports, but also the opinions of interested Departments and Agencies of the Executive Branch and other relevant and available information. Although the facts in this case do not all point in the same direction, as is evidenced by the lack of unanimity among the Tariff Commissioners who participated, the conclusion seems to me clear that, under the law which I am charged to uphold—in this instance Section 7 of the Trade Agreements Extension Act—the conditions for relief there established have been met.

"The Tariff Commission majority recommended that the minimum ad

valorem duty be increased to 22½% on all imported bicycles. This would mean an increase from 15% to 22½% on all types except the large wheel lightweight (wheel diameter over 25 inches, net weight less than 36 pounds) where the minimum duty would triple—from the present 7½% to the proposed 22½%' rate.

"I concur with the Commission majority's recommendation of a 22½% minimum rate of all types of bicycles other than the large wheel lightweights. It is my conclusion that the minimum rate for the latter category should be increased proportionately from 7½% to 11¼% instead of to 22½%.

\*    \*    \*    \*    \*    \*

"As for the other varieties of imports—the balloon tire, middleweight and junior size types, for example—I have not disturbed the Tariff Commission majority's recommendation for an increase in the minimum duty to 22½%. It is in these areas that the American industry has specialized and developed the market. Here the competition from imports is direct and thus most prone to cause serious injury. Recently increasing imports of these kinds of bicycles bear witness to this fact."

A cardinal rule of statutory construction is that the entire text of a statute must be considered and effect given to all the language contained therein. Nestle's Food Co., Inc., v. United States, 16 Ct.Cust.App. 451, T. D. 43199; Cassard Romano Co., v. United States, 19 C.C.P.A., Customs, 191, T.D. 45294.

To ascertain the meaning of one provision, reference is also made to other provisions of the same law for indications as to the sense in which particular terms were used by Congress when the law was enacted. United States v. Conkey & Co., 3 Ct.Cust.App. 245, T. D. 32564; Kenyon Co. v. United States, 4 Ct.Cust.App. 344, T. D. 33529; United States v. A. W. Faber, Inc., 16 Ct.Cust. App. 467, T. D. 43211.

Utilizing these basic principles of statutory construction in the case at bar, we must consider the language employed by Congress in originally granting to the President the power to negotiate tariff agreements with foreign countries as indicative of its intent with respect to the present provision. This grant of power was originally vested in the President by virtue of the Trade Agreement Act, approved June 12, 1934 (T. D. 47117, 19 U.S.C.A. § 1351) and modified from time to time. This section, as modified in 1955, contains the following pertinent language:

"§ 1351. Foreign trade agreements—Authority of President; modification and decrease of duties; applicability

"(a) (1) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

"(A) To enter into foreign trade agreements with foreign governments or instrumentalities thereof: *Provided,* That the enactment of the Trade Agreements Extension Act of

1955 shall not be construed to determine or indicate the approval or disapproval by the Congress of the executive agreement known as the General Agreement on Tariffs and Trade.

"(B) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder.

"(2) No proclamation pursuant to paragraph (1) (B) of this subsection shall be made—

"(A) Increasing by more than 50 per centum any rate of duty existing on January 1, 1945.

\* \* \* \* \* \*

"(5) The President may at any time terminate, in whole or in part, any proclamation made pursuant to this section."

At the same time as the above modification was enacted, the escape clause provision, originally enacted by the Act of June 16, 1951, 19 U.S.C.A. § 1364, was modified and contains the following pertinent language:

"(a) Upon the request of the President, upon resolution of either House of Congress, upon resolution of either the Committee on Finance of the Senate or the Committee on Ways and Means of the House of Representatives, upon its own motion, or upon application of any interested party, the United States Tariff Commission shall promptly make an investigation and make a report thereon not later than nine months after the application is made to determine whether any product upon which a concession has been granted under a trade agreement is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported into the United States in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products.

\* \* \* \* \* \*

"(c) Upon receipt of the Tariff Commission's report of its investigation and hearings, the President may make such adjustments in the rates of duty, impose such quotas, or make such other modifications as are found and reported by the Commission to be necessary to prevent or remedy serious injury to the respective domestic industry. If the President does not take such action within sixty days he shall immediately submit a report to the Committee on Ways and Means of the House and to the Committee on Finance of the Senate stating why he has not made such adjustments or modifications, or imposed such quotas."

A consideration of the language in section (c), *supra*, makes it evident that the authority granted to the President was discretionary. The President may accept or reject the report and recommendations of the Tariff Commission or "make such other modifications as are found and reported by the Commission to be necessary to prevent or remedy serious injury to the respective domestic industry." Since the President was given authority to adjust rates and impose quotas, the portion of the sentence above quoted, as construed by the majority opinion, results in the employment by Congress of useless language. It is a basic principle of law, which needs no citation, that Congress is presumed not to have done a useless act. However, under the construction given in the majority opinion, such a result is apparent. Since the President may adjust rates or impose quotas, what else in the way of modifications may the President impose?

A reasonable construction of the language employed in section 1364(c), *supra,* results in permitting the President to accept or reject in full the recommendations of the Commission or make such other modification (in conformity with the findings of the Commission). By virtue of such a construction, the President may accept the findings of the Commission with respect to injury but reject or modify the recommendations because of other considerations or factors. The President, in the instant case, did, in his letter to the Chairman of the Senate and House Committees, set forth in a clear and concise manner the reasons for his modification of the recommendations of the Commission.

In addition to utilizing all the language employed in a particular section of a statute to determine the intent of Congress, it is also incumbent upon the court to consider statutes *in pari materia.* In the construction of any section relating to trade agreements, we must ascertain the intent of Congress in enacting section 1351, as modified, *supra.* Subsection (a) (1), *supra,* sets forth the various reasons that Congress had in mind when granting power to enter into foreign trade agreements, i. e., expansion of foreign markets for products of the United States, removal of restrictions which are unduly burdening, etc. Certain limitations were also imposed upon the President, under subsection (2), *supra,* with respect to his authority to negotiate with foreign Governments or instrumentalities. However, in subsection (d) (5), the President was granted the right to terminate in whole or in part any of the proclamations made pursuant to this section. The provisions of this section, *supra,* and section 1364, *supra,* the escape clause, are *in pari materia* and must be construed together. Such a construction is indicative that the power granted to the President is discretionary and not one which binds the President to accept or reject in full the report or recommendations of the Tariff Commission.

It is my firm belief that Congress did not intend to tie the hands of the President when it granted to him this broad power. This belief appears to be affirmed when the legislative history of the escape clause provision is considered.

The report of the Committee on Ways and Means under the caption, "Continuation of Existing Safeguards," as it appears in the United States Code Congressional and Administrative News, 1955, page 2074, indicates the intent of Congress in granting to the President a discretionary power by the following:

"The committee believes that the President should give full consideration to the Tariff Commission's findings regarding injury. If he believes that these findings should be further developed, or if new information relevant to such findings are disclosed, in the committee's opinion he should continue his practice of submitting such data to the Tariff Commission for supplemental investigation and findings where appropriate. The other factors, relating to the overall national interest, are, of course, outside the jurisdiction of the Tariff Commission, and must be weighed by the President after receiving the views of the various departments. The committee is of the opinion that a President, who has the authority to determine where and when American Armed Forces may be employed in the Formosa Straits in the interest of our national security, can be trusted to weigh factors relating to the national interest in terms of withdrawing a tariff concession.

"Even on the question of injury, the President must by law make the determination in the event of a 3–3 split among the Tariff Commissioners.

"Findings on the question whether injury is caused or threatened by imports resulting from tariff concessions are based on factual material. However, proper weight must be giv-

en to such facts, reasonable inferences drawn therefrom, and, finally, there must be an exercise of judgment. Different weight can be given to the same facts, different inferences can be drawn from the same facts, and different judgments can result. Otherwise all administrative or judicial judgments would be unanimous and be affirmed on appeal. In practically every field where administrative or judicial findings are involved, the Congress has provided for some review of those findings, either by courts or by the President. In the committee's opinion it would be undesirable to depart from this practice in the case of the escape clause. Your committee believes that the President should not be compelled as a matter of law to accept findings of the Tariff Commission where it is his opinion that they are not soundly based, although in the committee's opinion he should give full consideration and proper weight to such findings."

It is a well-settled and long-established principle of law that a committee report submitted in connection with proposed customs legislation, which is subsequently enacted, is evidence of the intent of Congress in enacting the provision. Thos. H. Taylor and McDonald Brothers v. United States, T. D. 18915 (1898); United States v. Sickel, 6 Ct. Cust.App. 146, T. D. 35394; Kraft Phenix Cheese Corporation v. United States, 22 C.C.P.A., Customs, 111, T. D. 47103.

In the report of the Committee on Ways and Means, *supra,* it is clearly evident that the President has the power to exercise judgment in drawing inferences and in giving proper weight to the facts found by the Commission. The committee further recognizes that different weight can be given to the same facts, different inferences can be drawn, and different judgments can result.

The letter of August 18, 1955, *supra,* sets forth the reasons why different weight and different inferences were drawn by the President which resulted in a different judgment.

In view of the report of the Committee on Ways and Means, as well as a consideration of the language employed in section 1351, *supra,* and the principles of law governing statutory construction, I am unable to concur with the reasoning of my colleagues that the President must accept or reject the recommendations of the Tariff Commission. As to the conclusion and reasoning on other points considered by the court, I concur.