**FALCON SALES COMPANY, J. J. Murphy & Co.**

v.

**UNITED STATES.**

**C. D. 2292; Protest No. 59/20884.**

United States Customs Court
First Division.
Oct. 18, 1961.

Barnes, Richardson & Colburn, New York City, Glad & Tuttle, Associate Counsel, San Francisco, Cal. (J. Bradley Colburn and Norman C. Schwartz, New York City, of counsel), for plaintiffs.

William H. Orrick, Jr., Asst. Atty. Gen. (Richard E. FitzGibbon, Trial Atty.), New York City, for defendant.

Before OLIVER, MOLLISON and WILSON, Judges.

MOLLISON, Judge.

This protest is directed against the action of the collector of customs in assessing duty at the rate of 20 cents per gross under the provision in paragraph 412 of the Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 412, for "spring clothespins" on an importation of such clothespins.

The rate of duty applicable to spring clothespins under the provisions of paragraph 412, as originally enacted, was 20 cents per gross. By his proclamation of December 22, 1949 (No. 2867, 64 Stat. pt. 2, A380; T.D. 52373), supplemented by that of April 27, 1950 (No. 2884, 64 Stat., pt. 2, A399; T.D. 52462), carrying out the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade (hereinafter referred to as the Annecy protocol), the President of the United States put into effect the item (first 412) in part I of schedule XX of the said Annecy protocol, providing for a rate of duty of 10 cents per gross on spring clothespins which were entered, or withdrawn from warehouse, for consumption on or after April 30, 1950.

Upon request of an interested party, the United States Tariff Commission made an investigation under the authority of section 7 of the Trade Agreements Extension Act of 1951, as amended [1] here-

1. The pertinent portions of section 7 of the Trade Agreements Extension Act of 1951, as amended, 19 U.S.C.A. § 1364, and in effect at the time here involved, read as follows:

Sec. 7. "(a) Upon the request of the President, upon resolution of either House of Congress, upon resolution of either the Committee on Finance of the Senate or the Committee on Ways and Means of the House of Representatives, upon its own motion, or upon application of any interested party, * * * the United States Tariff Commission shall promptly make an investigation and make a report thereon not later than six months after the application is made to determine whether any product upon which a concession has been granted under a trade agreement is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported into the United States in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products.

"In the course of any such investigation, whenever it finds evidence of serious injury or threat of serious injury or whenever so directed by resolution of either the Committee on Finance of the Senate or the Committee on Ways and Means of the House of Representatives, the Tariff Commission shall hold hearings giving reasonable public notice thereof and shall afford reasonable opportunity for interested parties to be present, to produce evidence, and to be heard at such hearings.

"Should the Tariff Commission find, as the result of its investigation and hearings, that a product on which a concession has been granted is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products, it shall recommend to the President the withdrawal or modification of the concession, its suspension in whole or in part, or the establishment of import quotas, to the extent and for the time necessary to prevent or remedy such injury. The Tariff Commission shall immediately make public its findings and recommendations to the President, including any dissenting or separate findings and recommendations, and shall cause a summary thereof to be published in the Federal Register.

* * * * *

"(c) Upon receipt of the Tariff Commission's report of its investigation and hearings, the President may make such adjustments in the rates of duty, impose such quotas, or make such other modifications as are found and reported by the Commission to be necessary to prevent or remedy serious injury to the respective domestic industry. If the President does not take such action within sixty days he shall immediately submit a report to the Committee on Ways and Means of the House and to the Committee on Finance of the Senate stating why he has not made such adjustments or modifications, or imposed such quotas."

inafter referred to as section 7), to determine whether spring clothespins provided for in the said item of the Annecy protocol were, as a result of the duty or other customs treatment reflecting the concession made in the said item, being imported into the United States in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products.

Under date of September 10, 1957, the Tariff Commission reported the results of its investigation (No. 57) to the President, by which it found (one member dissenting):

"(1) That as a result in part of the customs treatment reflecting the concessions granted thereon in the General Agreement on Tariffs and Trade, spring clothespins provided for in paragraph 412 of the Tariff Act of 1930 and described in item 412 (first) in part I of schedule XX of the General Agreement on Tariffs and Trade (Annecy) are being imported into the United States in such increased quantities, both actual and relative, as to cause serious injury to the domestic industry producing like products; and

"(2) That in order to remedy such serious injury it is necessary, for an indefinite period, to limit the quantity of spring clothespins that may be entered, or withdrawn from warehouse, for consumption to an annual quota of 650,000 gross."

In the said report, the Commission recommended:

"* * * that the appropriate concession granted in the General Agreement on Tariffs and Trade be modified to permit the application of an annual absolute quota on imports of spring clothespins, as set forth in finding (2) above."

Pursuant to section 7(c) of the Trade Agreements Extension Act of 1951, as amended, the President addressed identical letters to the Chairman, Committee on Finance, United States Senate, and to the Chairman, Committee on Ways and Means, House of Representatives, reading as follows:

"I have carefully considered the report of the United States Tariff Commission in the case of spring clothespins, and I agree with the majority of the Commission that this case satisfies the statutory conditions for relief under Section 7 of the Trade Agreements Extension Act. As to the remedy to be applied, however, I do not find in the Commission's report a sufficient justification for imposing the quota recommended by four of the Commissioners.

"The Tariff Commission majority recommended an absolute quota limiting spring clothespin imports to 650,000 gross annually.

"Although the facts in this case do not all point in the same direction, as evidenced by the lack of unanimity among the Commissioners, the need for an absolute import quota has not been clearly established. Sales by the domestic industry, for example, have increased in recent years reaching an all-time high last year. Moreover, the evidence does not clearly show that the customary remedy would be inadequate. A ten cent-per-gross increase in the rate of duty on imports would seem to be appropriate relief in view of the existing price differentials for packaged and bulk clothespins, the clothespin-size characteristics of imports, and the economic condition of the domestic industry.

"Accordingly, I have taken the necessary steps to increase the rate of duty on imports of spring clothespins by ten cents per gross."

Concurrently therewith, he caused to be issued his proclamation No. 3211, 72 Stat., part 2, c14; T.D. 54493, providing that first item 412 specified in schedule XX of the Annecy protocol be withdrawn and that proclamation No. 2867 (as supplemented by proclamation No. 2884) be suspended, insofar as it applied to the

said item, effective after the close of business on December 9, 1957.

The effect of this action was to fix the rate of duty applicable to spring clothespins under paragraph 412 of the tariff act at 20 cents per gross. The reason for this is that, in the situation that the earlier proclamations were suspended or inoperative, no provision of law existed with respect to the rate of duty applicable to spring clothespins other than paragraph 412, as originally enacted by Congress, providing for a rate of 20 cents per gross.

The spring clothespins here involved were imported into the port of New York on July 9, 1958, and entered for consumption on the following day. As hereinbefore indicated, duty was assessed thereon by the collector at the rate of 20 cents per gross under the authority of proclamation No. 3211.

Briefly stated, the plaintiffs' contention is that, by proclamation No. 3211, the President acted outside the authority which the Congress delegated to him under section 7, supra; that his action was, therefore, illegal, null, and void; and that the correct rate of duty applicable to spring clothespins at the time of entry for consumption of the merchandise at bar was 10 cents per gross under paragraph 412 of the tariff act, as modified by proclamation Nos. 2867 and 2884.

Briefly stated, the defendant's contention is that the withdrawal of a concession and the termination of a former proclamation in part are not powers delegated to the President under section 7, supra, but are authority delegated under section 350(a) (5) of the Tariff Act of 1930, as amended, now 19 U.S.C.A. § 1351(a) (6).

In the brief filed in their behalf, plaintiffs' contention with respect to the invalidity of proclamation No. 3211 is based upon a construction of section 7, supra, to the effect that, in any proceeding thereunder, the discretion of the President is limited to acceptance or rejection *in toto* of the findings and recommendations of the Tariff Commission. Here, it is pointed out, the Tariff Commission found (1) that a statutory condition requisite for affirmative action under section 7, supra, existed, and (2) that the remedy for such condition would be the imposition of an annual absolute quota, and recommended that the concession granted in the Annecy protocol be modified to permit the application of such annual absolute quota.

The President accepted finding (1), but rejected finding (2) and the recommendation above, and, in lieu of the rejected finding and recommendation for an annual absolute quota, he put into effect a duty increase.

Cited as legally on all fours with the situation in this case, and dispositive of the issue, is the case of United States v. Schmidt Pritchard & Co., Mangano Cycles Co., 47 CCPA Customs 152, C.A.D. 750, certiorari denied, United States v. Schmidt Pritchard & Co., Mangano Cycles Co., 364 U.S. 919, 81 S.Ct. 283, 5 L.Ed.2d 259 (hereinafter referred to as the bicycle case). In that case, it appeared that, in the course of a proceeding under section 7, supra, a majority of the Tariff Commission found that, as a result, in part, of the duties reflecting concessions granted in the General Agreement on Tariffs and Trade, bicycles were being imported into the United States in such increased quantities as to cause serious injury to the domestic bicycle industry, and that increases in rates of duty were necessary to remedy such serious injury. It recommended a specific duty for each size classification of bicycles within certain ad valorem limits.

There, as here, the President accepted the finding with respect to the existence of serious injury to the domestic bicycle industry as the result, in part, of the concessions involved, and that increases in rates of duty were necessary to remedy such injury. However, he did not accept the finding and recommendation with respect to the amount of the increase necessary to remedy the injury, and proclaimed other and different rates of duty as to each size classification.

Duties having been assessed on an importation of one of the categories of bicycles named in the proclamation at the proclaimed rate, protest was filed by the importers and the issues duly came on to be heard in this court. A majority thereof sustained the two major contentions made by the plaintiff-importers, one of which, relating to compliance with the time limits prescribed by section 7, supra, is not involved in this case. The other contention was the same as that made herein, i. e., based upon the theory that section 7(c), supra, limits the President's discretion in action upon the Tariff Commission's report to acceptance or rejection of the remedies recommended by it. Schmidt Pritchard & Co. and Mangano Cycles Co. v. United States, 167 F.Supp. 272, 41 Cust.Ct. 108, C.D. 2029.

On appeal to the Court of Customs and Patent Appeals, that court determined the issue with respect to the time limits in favor of the Government, appellant, but affirmed the judgment of this court, holding that the President is authorized, under section 7, supra, only to accept or reject the recommendations of the Tariff Commission made pursuant to that section.

Pointing out that, in the bicycle matter, the President substituted increased rates of duty for the rates of duty recommended by the Commission, while, in the spring clothespin matter, he substituted an increase in the rate of duty for a recommended imposition of a quota, plaintiffs here contend that there is no legal difference between the situations in the two cases, and call for the application of the principles of decision derived from the bicycle case.

Defendant contends that the situations in the two cases are legally different. It is not denied that the President rejected the recommendation of the Tariff Commission for the imposition of an annual quota. It is contended, however, that the action he took *terminated in part* the earlier proclamation Nos. 2867 and 2884, and thereby withdrew the concession contained in the Annecy protocol.

Authority for terminating an earlier proclamation in whole or in part is claimed under the provision contained in section 350(a) of the Tariff Act of 1930, the Trade Agreements Act, as amended, and found in subparagraph (5) of the said section and subsection as in existence at the time here pertinent, that—

"* * * The President may at any time terminate, in whole or in part, any proclamation made pursuant to this section."

and article XIX of the General Agreement on Tariffs and Trade is cited as authority for the power to withdraw a concession in the circumstances of this case, i. e., upon a finding of serious injury to domestic producers resulting from the importation of increased quantities of a product which has been the subject of a tariff concession.

The residency of these powers in the President, it is claimed, exists independently of the powers delegated by section 7, supra, and, in any event, it is claimed that the enactment of section 7 did not result in any impairment or diminution thereof.

In short, defendant admits that, in proclamation No. 3211, the President did not act within the scope of the authority delegated to him under section 7, supra, but contends that his action was taken under other statutory authority, to wit, section 350(a) (5) of the Tariff Act of 1930, as amended and in effect at the time in question.

While the basic contentions of the defendant are stated in the brief filed in its behalf substantially as indicated above, unfortunately, little or no development of the contentions has been made.

Defendant seems to argue that because the *effect* of terminating in part the earlier proclamations under section 350(a) (5), supra, would be the same as suspending in part the said proclamations, the President must be presumed to have acted under authority of section 350(a) (5) rather than under authority of section 7, supra. No authority has been advanced

for the application of such a presumption to the action taken by the President.

Put another way, defendant contends that when the President, in proclamation No. 3211, proclaimed the *suspension in part* of the earlier proclamations, he meant the *termination in part* of such proclamations. No fact, reason, or authority has been advanced why the term used by the President, "suspended," should be read as "terminated."

Insofar as the rate of duty which would be applicable to spring clothespins is concerned, it is true that the suspension of the earlier proclamation Nos. 2867 and 2884, with respect to the item applying to spring clothespins, would have the same effect as the termination of such proclamations with respect to that item, that is to say, in either case, the action would restore the statutory rate originally enacted in the Tariff Act of 1930, there being in existence no other authority providing for any other rate.

Ordinarily, the verb "to terminate" would signify the act of ending something, implying a final and conclusive act, a complete cessation of effect, whereas the verb "to suspend" signifies the act of stopping for a time, implying a temporary inoperative condition. Whether one term or the other was used would seem to be a question of intent, on the one hand, to halt an existing condition, with no present thought of reactivating it in the future, or, on the other hand, to place it in a state of dormancy with future reinstatement to operation a presently considered possibility.

Moreover, it would appear that in matters having an international aspect, such as trade agreements and proclamations issued in connection therewith, there may very well be political effects flowing from the action of terminating as against the action of suspending a former proclamation, which effects would be strong considerations influencing Presidential choice of one course or the other. Merely because, for the moment, either course would result in the imposition of the same rate of duty does not establish that the terms have, or were intended to have, completely interchangeable meaning.

It is not a question of what the President could have done; it is a question of what he actually did, and what he did was obviously directed toward following the procedure of section 7, supra, with the purpose, under authority of that section, of suspending in part, not terminating in part, the earlier proclamations.

The precise meaning which the President intended to convey is, we think, made manifest by a reading of the recitals and the announcement in proclamation No. 3211.

The recitals, setting forth the background of the action to be taken, demonstrate that the President was impelled to action by the report of the Tariff Commission of its investigation under section 7, supra. In recital No. 7 the President finds—

"* * * that in order to remedy the serious injury to the said domestic industry it is necessary that there be applied, *for an indefinite period,* a duty of 20 cents per gross on spring clothespins described in the said first item 412; * * *." [Italics added.]

The words "for an indefinite period" do not bespeak an intention to terminate a proclaimed rate, but rather one to suspend such rate, and this latter is precisely the action which the President announced he was taking by his use of the following language:

"Now, Therefore, I, Dwight D. Eisenhower, President of the United States of America, acting under the authority vested in me by section 350 of the Tariff Act of 1930, as amended, and by section 7(c) of the Trade Agreements Extension Act of 1951, as amended, and in accordance with the provisions of Article XIX of the said General Agreement on Tariffs and Trade * * * do proclaim that, effective after the close of business on December 9, 1957, *and until the President otherwise proclaims*—

"(a) The said first item 412 in the said Schedule XX shall be with-

drawn, and Proclamation No. 2867 of December 22, 1949, as supplemented, *shall be suspended* insofar as it applies to the said first item 412; \* \* \*." [Italics added.]

It clearly appears, therefore, that the President intended to suspend the previous proclamations under authority of section 7. Whether, under the circumstances presented to him, he would have terminated them under authority of section 350(a) (5) of the tariff act, as amended, we are not able to determine. We cannot say that the President equated suspension with termination, and that he, in any event, intended to achieve the effect of raising a tariff duty, regardless of the methods or powers used for that purpose.

In the bicycle case, a similar argument, i. e., that the President might terminate a previous proclamation under authority of section 350(a) at any time, was made to our appellate court. The argument was rejected on the ground that the question at issue was one of authority delegated by Congress within the clearly expressed limitations of section 7.

We are of the opinion that the reasoning and rule of the bicycle case are applicable to the situation in this case and, accordingly, hold that, inasmuch as Presidential Proclamation No. 3211 provides for customs treatment of spring clothespins classifiable under paragraph 412, supra, other than that found and reported by the Tariff Commission to be necessary to prevent or remedy serious injury to the domestic industry involved, the said proclamation exceeds the authority delegated to the President by the Congress and is, therefore, void.

Because of such invalidity, the proclamation was incapable of suspending the earlier proclamations, and the rate of duty therein prescribed is the proper rate applicable to the spring clothespins at bar. Judgment will, therefore, issue sustaining the protest claim for duty at the rate of 10 cents per gross under paragraph 412, Tariff Act of 1930, as modified by proclamation Nos. 2867 and 2884.