**YOSHIDA INTERNATIONAL, INC.**

**v.**

**UNITED STATES.**

C.D. 4550; Court No. 72-2-00314.

United States Customs Court.

July 8, 1974.

Barnes, Richardson & Colburn, New York City (Schwartz & Lidstrom, New York City, and Glad, Tuttle & White, San Francisco, Cal., associate counsel; J. Bradley Colburn, Earl R. Lidstrom, Rufus E. Jarman, Jr. and David O. Elliott, New York City, of counsel), for plaintiff.

Carla A. Hills, Asst. Atty. Gen. (Andrew P. Vance and Frederick L. Ikenson, New York City, trial attys.), for defendant.

Before BOE, Chief Judge, and MALETZ and RE, Judges.[1]

BOE, Chief Judge:

The plaintiff has filed a motion for summary judgment challenging the va-

lidity of Presidential Proclamation 4074 promulgated August 15, 1971, which imposed a surcharge in the form of a supplemental duty in the amount of 10 percent ad valorem upon most articles imported into the United States from and after August 16, 1971. The merchandise involved herein—consisting of zippers—was imported from Japan and entered at the port of New York on August 17, 25 and 26, 1971. In addition to being assessed with duty at the rate of 23.5 percent ad valorem pursuant to item 745.72, Tariff Schedules of the United States, the merchandise in question was assessed with an additional duty of 10 percent ad valorem pursuant to item 948.00 which was added to the tariff schedules by Presidential Proclamation 4074.

The defendant has filed a cross-motion for summary judgment contending that Presidential Proclamation 4074 was lawfully authorized by (1) the "termination" authority delegated to the President by the Congress in section 350(a)(6) of the Tariff Act of 1930, as amended (19 U.S.C. § 1351(a)(6)) and section 255(b) of the Trade Expansion Act of 1962 (19 U.S.C. § 1885(b)); and (2) the authority vested in the President by section 5(b) of the Trading with the Enemy Act, as amended (50 U. S.C. App. § 5(b)).

Presidential Proclamation 4074 provides in relevant part (F.R.Doc. 71–12120):

*Whereas,* there has been a prolonged decline in the international monetary reserves of the United States, and our trade and international competitive position is seriously threatened and, as a result, our continued ability to assure our security could be impaired;

*Whereas,* the balance of payments position of the United States requires the imposition of a surcharge on dutiable imports;

*Whereas,* pursuant to the authority vested in him by the Constitution and

---

1. The three-judge panel in this case was designated by the chief judge upon application of the parties pursuant to section 108 of the Customs Courts Act of 1970 (28 U.S.C. § 255) and rule 4.13 of this court.

the statutes, including, but not limited to, the Tariff Act of 1930, as amended (hereinafter referred to as "the Tariff Act"), and the Trade Expansion Act of 1962 (hereinafter referred to as "the TEA"), the President entered into, and proclaimed tariff rates under, trade agreements with foreign countries;

*Whereas,* under the Tariff Act, the TEA, and other provisions of law, the President may, at any time, modify or terminate, in whole or in part, any proclamation made under his authority;

*Now, Therefore, I, Richard Nixon,* President of the United States of America acting under the authority vested in me by the Constitution and the statutes, including, but not limited to, the Tariff Act, and the TEA, respectively, do proclaim as follows;

A. I hereby declare a national emergency during which I call upon the public and private sector to make the efforts necessary to strengthen the international economic position of the United States.

B. (1) I hereby terminate in part for such period as may be necessary and modify prior Presidential Proclamations which carry out trade agreements insofar as such proclamations are inconsistent with, or proclaim duties different from, those made effective pursuant to the terms of this Proclamation.

(2) Such proclamations are suspended only insofar as is required to assess a surcharge in the form of a supplemental duty amounting to 10 percent ad valorem. Such supplemental duty shall be imposed on all dutiable articles imported into the customs territory of the United States from outside thereof, which are entered, or withdrawn from warehouse, for consumption after 12:01 a. m., August 16, 1971, provided, however, that if the imposition of an additional duty of 10 percent ad valorem would cause the total duty or charge payable to exceed the total duty or charge payable at the rate prescribed in column 2 of the Tar-iff Schedules of the United States, then the column 2 rate shall apply.

C. To implement section B of this Proclamation, the following new subpart shall be inserted after subpart B of part 2 of the Appendix to the Tariff Schedules of the United States:

## SUBPART C—TEMPORARY MODIFICATIONS FOR BALANCE OF PAYMENTS PURPOSES

*Subpart C headnotes:*

1. This subpart contains modifications of the provisions of the tariff schedules proclaimed by the President in Proclamation 4074.

2. *Additional duties imposed*—The duties provided for in this subpart are cumulative duties which apply in addition to the duties otherwise imposed on the articles involved. The provisions for these duties are effective with respect to articles entered on and after 12:01 a. m., August 16, 1971, and shall continue in effect until modified or terminated by the President or by the Secretary of the Treasury (hereinafter referred to as the Secretary) in accordance with headnote 4 of this subpart.

3. *Limitation on additional duties*— The additional 10 percent rate of duty specified in rate of duty column numbered 1 of item 948.00 shall in no event exceed that rate which, when added to the column numbered 1 rate imposed on the imported article under the appropriate item in schedules 1 through 7 of these schedules, would result in an aggregated rate in excess of the rate provided for such article in rate of duty column numbered 2.

4. For the purposes of this subpart—

(a) *Delegation of authority to Secretary*—The Secretary may from time to time take action to reduce, eliminate or reimpose the rate of additional duty herein or to establish exemption therefrom, either generally or with respect to an article which he may specify either generally or as the product of a particu-

lar country, if he determines that such action is consistent with safeguarding the balance of payments position of the United States.

\* \* \* \* \* \*

(c) *Authority to prescribe rules and regulations*—The Secretary is authorized to prescribe such rules and regulations as he determines to be necessary or appropriate to carry out the provisions of this subpart.

5. *Articles exempt from the additional duties*—In accordance with determinations made by the Secretary in accordance with headnote 4(a), the following described articles are exempt from the provisions of this subpart:

\* \* \* \* \* \*

| Item | Article | Rates of duty | |
|------|---------|-----|-----|
| | | 1 | 2 |
| 948.00 | Articles, except as exempted under headnote 5 of this subpart, which are not free of duty under these schedules and which are the subject of tariff concessions granted by the United States in trade agreements ...................... | 10% ad val. . . . (See headnote 3 of this subpart.) | No change. |

D. This Proclamation shall be effective 12:01 a. m., August 16, 1971.

\* \* \* \* \* \*

## I

The courts on frequent occasions have considered the question relating to the right of the legislative branch of government to delegate the powers vested in it by the Constitution to the executive branch. It would be only time-consuming to review these many decisions at length. Suffice it to say that the Congress cannot divest itself of the legislative powers with which it has been constitutionally invested. See e. g., Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892); Hampton & Co. v. United States, 276 U.S. 394, 48 S. Ct. 348, 72 L.Ed. 624 (1928). As stated in Field v. Clark, *supra*, 143 U.S. p. 692, 12 S.Ct. p. 504, this principle is

\* \* \* universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution. \* \* \*

Again, the Supreme Court in Schechter Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), reiterated this principle in stating that the Congress cannot delegate its legislative authority to others to exercise the unfettered discretion to make whatever laws may be thought to be needed or advisable for the rehabilitation and expansion of trade or industry.

As domestic problems and international relations have become more complex throughout the course of the history of our country, it concurrently has been recognized that our three branches of government are coordinated parts of one government, and that these partners in purpose and objective must utilize, as needed, the assistance and efforts of the others in carrying forth the powers, duties, and responsibilities with which they have been initially invested. Thus, the legislative branch has delegated to the executive branch the powers, *inter alia*, to determine fair and just rates in interstate commerce, to proclaim an em-

bargo on the sale of arms and munitions to foreign nations, to change rates of duties under prescribed procedures. Field v. Clark, *supra;* United States v. Curtiss-Wright Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); Interstate Commerce Commission v. Goodrich Transit Co., 224 U.S. 194, 32 S.Ct. 436, 56 L.Ed. 729 (1912); Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

No inflexible standard can be applied in ascertaining the degree of assistance that one branch of government might give to another. As pointed out in Hampton & Co. v. United States, *supra,* 276 U.S. p. 406, 48 S.Ct. p. 351:

> \* \* \* In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination.

Although in its early history Congress itself established tariff rates through legislative enactment, the passing of time has seen the delegation of much of this authority to the President, subject, however, to prescribed standards and guidelines enunciating an "intelligible principle" to which conformance is required. Hampton & Co. v. United States, *supra,* p. 409, 48 S.Ct. 348. In Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 318, 53 S.Ct 350, 359, 77 L.Ed. 796 (1933), the Court recognized the foregoing stating:

> \* \* \* Neither the action of Congress in fixing a new tariff nor that of the President in exercising his delegated power is subject to impeachment if the prescribed forms of legislation have been regularly observed.
> \* \* \*

The Tariff Act of 1930, as amended, and the Trade Expansion Act of 1962 were enacted by the Congress in full appreciation of the inability of the legislative branch to singly supervise or ad-

minister that comprehensive power vested in it by article I, section 8 of the Constitution which provides that:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises \* \* \*.

Congress has delegated by these Acts broad and general authority to the President to enter into negotiations with foreign nations to the end that bilateral trade agreements might be effected by the contracting parties. As a corollary power, the President has been further authorized to proclaim such modifications with respect to existing duties or other import restrictions as may be required to carry out the provisions of any particular negotiated trade agreement. Inasmuch as a trade agreement is not self-executing the provisions or modifications contained therein must be proclaimed by the President in order that they have the effect of domestic law.

Thus, section 350 of the Tariff Act of 1930, as amended (19 U.S.C. § 1351), provides in part:

> (a)(1) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will

be promoted by the means hereinafter specified, is authorized from time to time—

(A) To enter into foreign trade agreements with foreign governments or instrumentalities thereof: *Provided,* That the enactment of the Trade Agreements Extension Act of 1955 shall not be construed to determine or indicate the approval or disapproval by the Congress of the executive agreement known as the General Agreement on Tariffs and Trade.

(B) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder.

Similar provisions were again included by the Congress in the enactment of the Trade Expansion Act of 1962 (19 U.S.C. § 1801 et seq.). Section 201 of that Act (19 U.S.C. § 1821) provides:

(a) Whenever the President determines that any existing duties or other import restrictions of any foreign country or the United States are unduly burdening and restricting the foreign trade of the United States and that any of the purposes stated in section 1801 of this title will be promoted thereby, the President may—

(1) after June 30, 1962, and before July 1, 1967, enter into trade agreements with foreign countries or instrumentalities thereof; and

(2) proclaim such modification or continuance of any existing duty or other import restriction, such continuance of existing duty-free or excise treatment, or such additional import restrictions, as he determines to be required or appropriate to carry out any such trade agreement.

In the same manner as the President has been authorized and given discretion to enter into bilateral trade agreements and to implement them by proclamation, he likewise has been given authority to terminate trade agreements previously negotiated.[2]

Under the so-called escape clause, section 351 of the Trade Expansion Act of 1962 (19 U.S.C. § 1981), the President may increase duties on articles causing or threatening injury to the United States, after an affirmative finding by the Tariff Commission and compliance with other procedures. Under section 252 of the Trade Expansion Act of 1962 (19 U.S.C. § 1882), the President may increase duties or suspend trade agreement concessions to retaliate against unjustifiable import restrictions, nontariff barriers, etc., upon compliance with stated procedures related to public hearings and the presentation of recommendations concerning foreign import restrictions. Under the so-called flexible tariff provision, section 336 of the Tariff Act of 1930, as amended (19 U.S.C. § 1336), the President may, after appropriate finding by the Tariff Commission, proclaim increased duties to equalize differ-

---

2. Section 2(b) of the Tariff Act of 1930, as amended (19 U.S.C. § 1352(b)) provides:

(b) Every foreign trade agreement concluded pursuant to this part shall be subject to termination, upon due notice to the foreign government concerned, at the end of not more than three years from the date on which the agreement comes into force, and, if not then terminated, shall be subject to termination thereafter upon not more than six months' notice.

Section 255(a) of the Trade Expansion Act of 1962 (19 U.S.C. § 1885(a)) similarly provides:

(a) Every trade agreement entered into under this subchapter shall be subject to termination or withdrawal, upon due notice, at the end of a period specified in the agreement. Such period shall be not more than 3 years from the date on which the agreement becomes effective. If the agreement is not terminated or withdrawn from at the end of the period so specified, it shall be subject to termination or withdrawal thereafter upon not more than 6 months' notice.

ences in cost of production. These statutes, in short, authorize the President to increase duties in certain situations that are not here applicable, provided that specific procedures are followed.

Finally, the President has been delegated authority to "terminate, in whole or in part," prior proclamations which have implemented the provisions of foreign trade agreements. And it is this power, defendant contends, which authorized the President to impose the additional 10 percent duty here in issue.

In this connection, it is to be noted that section (B)(1) of Presidential Proclamation 4074 provides:

I hereby terminate in part for such period as may be necessary and modify prior Presidential Proclamations which carry out trade agreements insofar as such proclamations are inconsistent with, or proclaim duties different from, those made effective pursuant to the terms of this Proclamation.

There can be no doubt that this phraseology, viewed in its customary and ordinary usage, is intended as the exercise of the power of termination.

The statutes are brief and concise in delineating this prerogative. Section 350(a)(6) of the Tariff Act of 1930, as amended (19 U.S.C. § 1351(a)(6)) provides:

The President may at any time terminate, in whole or in part, any proclamation made pursuant to this section.

Similarly, section 255(b) of the Trade Expansion Act of 1962 (19 U.S.C. § 1885(b)) provides:

The President may at any time terminate, in whole or in part, any proclamation made under this subchapter.

Against this background, the question is whether the President, in the assessment of the supplemental duty provided for in Presidential Proclamation 4074, acted beyond the authority so delegated to him by the Congress.

Viewing this Proclamation in the light of the statutory authority delegated by the Congress, it would appear that it is hybrid in character. Although an effort is made to "terminate" and "suspend" prior proclamations in the same breath, presumably in the hope that some justifying authority might be thereby synthesized, there can be little doubt that the basic authority and justification for the President's action therein was predicated on the termination powers conferred by section 350(a)(6) of the Tariff Act and section 255(b) of the Trade Expansion Act.[3]

We conclude that the authority granted by statute to "terminate, in whole or in part, any proclamation" does not include the power to determine and fix unilaterally a rate of duty which has not been previously legally established. On the contrary, the "termination" authority, as statutorily granted, merely provides the President with a mechanical procedure of supplanting or replacing existing rates with rates which have been established by prior proclamations or by statute. Relevant thereto is United States v. American Bitumuls & Asphalt Co., C.A.D. 661, 246 F.2d 270, 44 CCPA 199 (1957), cert. denied, 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113 (1957). In that case, the collector of customs, pursuant to Presidential Proclamation 2901, assessed a duty of ½ cent a gallon on imported petroleum products, which proclamation the importer claimed to be invalid in that it increased the rate of duty in excess of the amount of 50 percent as provided by section 350(a)(2) of the Tariff Act of 1930, as amended (19 U.S.C. § 1351(a)(2)). In determining such a 50 percent increase limitation not to be applicable to proclamations termi-

3. Thus, the General Counsel of the Treasury in his opinion with respect to the legal basis for the imposition of the surcharge predicated the action of the President in making this assessment on the termination authority. Op. General Counsel (Treas. Dept.) No. 822, Sept. 21, 1971.

nating other proclamations, our appellate court stated (246 F.2d, p. 275, 44 CCPA, p. 205):

> There is a logical reason for placing a limitation on the tariff changes which may be effected by proclamations giving effect or carrying-out trade agreements but not on those which merely terminate other proclamations, since the latter can do no more than restore rates which have already been legally established, and are thus inherently limited. [Emphasis in original.] [4]

General headnote 4(d) of the tariff schedules codifies this principle and provides clear legislative direction with respect to the effect resulting from the termination of a proclamation:

> [W]henever a proclaimed rate is terminated or suspended, the rate shall revert, unless otherwise provided, to the next intervening proclaimed rate previously superseded but not terminated or, if none, to the statutory rate.

This headnote is clarified by the following statement in the Tariff Classification Study Submitting Report (Nov. 15, 1960), p. 17:

> Headnote 4 relates to the effect, in each of the two numbered rate columns of the tariff schedules, of changes in rates of duty by legislative enactment and by proclamation of the President pursuant to delegated authority under the trade-agreements legislation and section 336 of the Tariff Act of 1930 (the so-called flexible-tariff provision). This headnote explicitly expresses the difference in legal effect between statutory (amended) rates of duty and proclaimed (modified) rates of duty. A permanent statutory amendment of a rate of duty supersedes and terminates the existing rate, whereas a proclaimed (modified) rate supersedes but does not terminate the existing rate of duty. For example, if an original statutory rate of 30 percent ad valorem applicable to an article is "modified" to 40 percent by proclamation issued pursuant to section 336 and thereafter is modified to 20 percent by proclamation under the trade-agreements legislation, the original rate of 30 percent was superseded but not terminated by the 40-percent rate and the 40-percent rate was superseded but not terminated by the 20-percent rate. The "modified" rate of 40 percent proclaimed pursuant to section 336 would be reflected in both rate columns, whereas the "modified" rate of 20 percent proclaimed pursuant to section 350 would be reflected only in column numbered 1. On the other hand, if the Congress should enact permanent legislation changing the 20-percent rate to 15 percent, such amendment would terminate and supersede the previous rates of duty in both rate columns unless otherwise specified in the amending statute.

> *General headnote 4(d) treats with the situation where a proclaimed rate is terminated or suspended. If in the example previously given, the 20-percent rate proclaimed pursuant to the trade-agreements authority were terminated or suspended, the new rate would become 40 percent since this is the next intervening proclaimed rate previously superseded but not terminated. If the 40-percent rate should thereafter be terminated or suspended the rate would revert to the statutory rate of 30 percent.* [Emphasis added.]

Defendant contends, however, that the phrase in general headnote 4(d), "unless otherwise provided" indicates recognition of a discretionary authority to establish a new intermediate rate in conjunction with the statutory authority to "terminate * * * in part." We cannot agree.

---

4. See also United States v. Metropolitan Petroleum Corp., 42 CCPA 38, C.A.D. 567 (1954); Barclay & Company, Inc. v. United States, 47 CCPA 133, C.A.D. 745 (1960).

In our view that phrase is nothing more than an exception to the provision contained in headnote 4(d) fixing the order of rate reversion resulting from a termination proclamation. More specifically, the phrase "unless otherwise provided" gives the President discretionary authority when terminating a proclamation to specify a rate established in a specific previous proclamation other than the next intervening proclamation and thus avoid an automatic reversion to the next intervening proclaimed rate. In other words, the phrase "unless otherwise provided" contemplates only the exercise of Presidential discretion to preclude the order of reversion set forth in general headnote 4(d).

█ █ This court likewise is unable to accept the further argument propounded by the defendant—that the maxim of statutory construction providing that a broader authority includes the lesser—is applicable to the case at bar. In reference thereto, the defendant suggests that if the President has the power to terminate all prior proclamations, thus bringing into effect the statutory rate, *a fortiori*, he has the power to impose a new rate, higher than the terminated rate, yet lower than the statutory note. Such a conclusion is fallacious. The power granted to the President with respect to the adjustment of rates pursuant to his termination authority is limited to the use of termination proclamations (1) to increase rates to the highest level, *i. e.*, the statutory rate, or (2) to raise or lower rates to conform to rates which have been established by a prior proclamation. In either of these instances, the rates, to which conformance may be sought, have been previously established either by the Congress (statutory rate) or by a bilateral negotiation embodied in a trade agreement pursuant to statutory authority. In short, the power to fix a new and independent rate requires a greater grant of power than that delegated to the President by the termination authority. Pursuant to the latter authority, the President is constrained, with the exception noted above, to follow a fixed order of reversion established by the Congress, "resting" only on those rates previously established. Indeed, should the establishment of new and independent rates be considered a lesser power included in the termination authority, all concession rates previously established through bilateral negotiation could be totally ignored thereby giving the President complete and broad discretion to impose any rate whatsoever up to the statutory rate. We fail to find wherein the statutes evidence an intention on the part of the Congress to grant the President such unrestrained unilateral authority.

█ Nor can we accept the construction urged by the defendant that the phrase "terminate * * * in part" as distinguished from "terminate in whole" authorizes the establishment of new intermediate rates. It is manifest that the phrase "terminate * * * in part" can be given no other meaning than that which the individual words signify. Thus, the word "terminate" signifies "the act of ending something, implying a final and conclusive act, a complete cessation of effect * * *." Falcon Sales Company v. United States, 47 Cust.Ct. 129, 135, C.D. 2292, 199 F. Supp. 97, 102 (1961). Its meaning is not interchangeable with the word "suspend" which "signifies the act of stopping for a time, implying a temporary inoperative condition." *Ibid.* In light of these considerations, no rationalization will permit an implication to be derived from the phrase "terminate * * * in part" that existing proclaimed rates can be suspended and temporarily supplanted by new rates determined solely by the President. The discretionary authority contained in the provision "terminate, in whole or in part" is twofold: (1) to nullify and bring to an end an entire proclamation; and (2) to specify the extent to which a prior proclamation is terminated, there-

by permitting a portion thereof to remain in effect.[5]

The legislative history likewise indicates that the authority delegated to the President "to terminate, in whole or in part, any proclamation" was not intended by the Congress to grant him the power to determine and fix unilaterally an intermediate rate of duty which had not been previously legally established. It is to be noted in this connection that the Administration's draft bill for the Trade Expansion Act of 1962—H.R. 9900—contained a proposed section 244(b) to give the President the authority to establish such new intermediate rates as an incident to the power to terminate in part. See Hearings before the House Committee on Ways and Means on H.R. 9900—Trade Expansion Act of 1962 (87th Cong., 2d Sess., 1962, p. 17) (hereafter referred to as "House Hearings"). The proposed section 244(b) provided (House Hearings, p. 17):

> (b) The President may at any time terminate, in whole or in part, any proclamation issued under this title. Termination in part of a proclamation reducing a rate of duty may include the proclamation, as required or appropriate to carry out any trade agreement under this title or any predecessor Act, of a rate of duty higher than such reduced rate but not higher than the rate which would have been applicable if the proclamation had been terminated in whole.

An accompanying section-by-section analysis of H.R. 9900 prepared by the executive branch contains the following statement with respect to proposed section 244(b) (House Hearings, p. 37):

> The first sentence of subsection (b) is substantially identical to section 350(a)(6) of the Tariff Act of 1930, as amended, and provides that the President may at any time terminate, in whole or in part, any proclamation

issued under title II. The second sentence is a new technical provision which permits the President, when terminating in part a proclamation reducing a rate of duty, to establish a new rate of duty at any point in the range above the reduced rate but no higher than the rate which would have been applicable if the proclamation had been terminated in whole. Such authority would be of use in negotiations under article XXVIII of the General Agreement on Tariffs and Trade (hereinafter referred to as GATT) where it is occasionally desirable to agree to make increases in rates of duty.

In addition, a memorandum prepared by the Tariff Commission for the Ways and Means Committee comments on proposed section 244(b), as follows (House Hearings, pp. 951–2):

> 3. *Termination of Proclamations.*—Section 244(b) of the bill provides that the President may at any time terminate, in whole or in part, any proclamations issued under Title II of the bill; i. e., proclamations prescribing continuance, reduction, or elimination of duties or other import restrictions, or continuance of existing duty-free or excise treatment, required or appropriate to carry out a trade agreement negotiated under the proposed authority, and proclamations prescribing treatment to "adjust" imports to protect the national security. This section further provides that termination in part of a proclamation reducing a rate of duty may include—
>
> the proclamation, as required or appropriate to carry out any trade agreement under this title [i. e., Title II of the bill] or any predecessor Act, of a rate of duty higher than such reduced rate but not higher than the rate which would have been applicable if the proclamation had been terminated in whole.

5. See Presidential Proclamation 3762, 81 Stat. 1076 (1967), by the terms of which Presidential Proclamation 3455 was terminated in whole and Presidential Proclamation 3458 was terminated to the extent that it modified Presidential Proclamation 3455.

The provision regarding partial termination of a proclamation issued under title II raises several questions. This authority to proclaim an intermediate rate of duty seems to be clearly related only to the new grant of authority in title II of the bill.[1]

1. The continuation of the existing proclaiming authority in section 350 is provided for separately in section 248(a)(1) of the bill. It will be noted that section 248(a)(1) does not include a provision with respect to proclaiming intermediate rates of duty. Furthermore, section 248(a)(1) expressly continues the authority contained in the present section 350(a)(6) to terminate, in whole or in part, any proclamation of trade agreements entered into pursuant to section 350, a fact which further militates in favor of reading section 244(b) of the proposed legislation as relating only to proclamations issued to carry out trade agreements entered into under the proposed legislation.

Inasmuch as title II does not contain authority to negotiate increases in rates of duty, it is not clear how a basis could be laid in a trade agreement entered into under title II for the proclamation of the aforementioned higher intermediate rate of duty.

From the foregoing, it seems clear that it was the executive branch's intent in proposing section 244(b) to give the President authority—which he did not previously have—to establish new intermediate rates as an incident to the power to terminate in part. It is significant, however, that the second sentence of proposed section 244(b) was eliminated when the Ways and Means Committee reported H.R. 11970 as a clean bill which the Congress subsequently enacted. The fact that Congress considered granting the President new authority to establish new, intermediate rates as an incident to the power to terminate in part, and rejected it, indicated that Congress concluded that the President should not have power to choose rates which never existed in prior statutes or proclamations.

Additionally, it is to be observed that the Senate adopted an amendment to H. R. 11970, the Trade Expansion bill, which would have added a new section 353, as follows (108 Cong.Rec. 19875 (1962)):

Notwithstanding any other provision of law, the President may, when he finds it in the national interest, proclaim with respect to any article imported into the United States—

(1) the increase of any existing duty on such article to such rate as he finds necessary,

(2) the imposition of a duty on such article (if it is not otherwise subject to duty) at such rate as he finds necessary, and

(3) the imposition of such other import restrictions as he finds necessary.

It is obvious that had this provision been enacted into law, it would have authorized a surcharge such as provided for in Presidential Proclamation 4074. However, the provision was deleted by the House-Senate Conference Committee. Conference Report No. 2518 (87th Cong., 2d Sess. (1962) (2 U.S.Code Cong. & Admin.News (1962), p. 3142)). Deletion of the provision not only demonstrates that Congress was unwilling to grant such expansive discretionary power to the President, but also indicates a probable recognition by Congress that such an unrestrained grant of authority to increase existing duties and impose nonexisting duties may well have been an invalid delegation of legislative power vested solely in the Congress by the Constitution.[6]

6. Senator Byrd, Chairman of the Senate Finance Committee, reviewing in the Senate the actions of the conferees with respect to H.R. 11970, indicated that several factors led to the rejection of section 353 in conference (108 Cong.Rec. 22182 (1962)):

* * * Section 353 was a sword which would cut two ways: First, one problem was that there was no procedure prescribed for ascertaining the facts and, second, *the other problem was that the Congress did not retain the same opportunity for review as the other sections of the bill provide.* [Emphasis added.]

Nor can this court agree with defendant's contention that prior Presidential proclamations serve as a precedent for the President's alleged authority to establish intermediate rates. Presidential Proclamation 2901, 64 Stat. A427 (1950), cited by the defendant, provided for a reduction during the period of one year in the quantity of potatoes subject to the reduced tariff quota in the General Agreement on Tariffs and Trade (GATT). By reducing the quantity of potatoes subject to the quota rate, the Presidential Proclamation did nothing more than expose the possibility of more imported potatoes to the higher statutory rate. Unlike the effort to establish new supplemental intermediate rates as proposed by Presidential Proclamation 4074, Presidential Proclamation 2901 changed neither the concession rate nor the statutory rate. No intermediate nor supplemental duty was established whatsoever.

Defendant cites Presidential Proclamation 2929, 65 Stat. C12 (1951), in further support of its assertion that the President has established new intermediate rates in his exercise of the "termination" authority. Examination of the history with respect thereto discloses that the Torquay Protocol, a new trade agreement between participating nations, provided for an increase on certain gloves from the 25 percent duty (the previous rate established by the GATT (T.D. 51802, schedule XX, pp. 162–163)) to a rate of 35 percent (T.D. 52739, p. 212). Presidential Proclamation 2929, in proclaiming the new trade agreement rates, specifically excepted in part I certain items and provided in part III that all prior proclamations "are hereby terminated to the extent" that the items therein specified are modified by the Torquay Protocol. See 65 Stat. C17–C18.

In the opinion of this court, Presidential Proclamation 2929 clearly was predicated on the authority to proclaim trade agreement rates as provided by section 350(a)(1)(B) of the Tariff Act of 1930, as amended (19 U.S.C. § 1351(a)(1)(B)). This conclusion is confirmed by the decision of the appellate court in United States v. Aris Gloves, Inc., 48 CCPA 126, C.A.D. 777 (1961). In determining therein that public notice of intention to negotiate the trade agreement (Torquay Protocol) rates relating to gloves had been properly given, as required by statute, the court must necessarily have recognized that the new rate was a modification agreed upon as a part of the Torquay Protocol and given domestic effect by the proclamation of the new trade agreement rates. Since a statutory requirement of notice is not required in a unilateral act of termination, a decision of the appellate court, would have been needless had the new rates in question been established under the termination authority. Hence, while Presidential Proclamation 2929 was used as the vehicle by which prior rates relating to certain gloves were "terminated in part," the exercise of the termination authority was merely ancillary to the primary purpose and effect of the proclamation—which was to give domestic legal effect to the new rates established by the Torquay Protocol and thus cause these new rates to apply to those gloves, the prior rates of which had been terminated in part.

Accordingly, it is the opinion of this court that Presidential Proclamation 4074 cannot be sustained by the termination authority and that the Proclamation, in fact, arrogated unto the President a power beyond the scope of any authority delegated to him by the Congress. The assessment of the surcharge constituted an affirmative unilateral act on the part of the Executive which cannot be viewed nor rationalized in any way other than an unauthorized imposition of a new and additional duty. Indeed, to invest the President with the powers contended by the defendant would render the proceedings and guidelines enumerated in other tariff legislation meaningless. See United States v.

Schmidt Pritchard & Co., 47 CCPA 152, C.A.D. 750 (1960), cert. denied, 364 U.S. 919, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960).

## II.

■ With respect to defendant's contention that the Trading with the Enemy Act (50 U.S.C. App.) serves as further authority for the validity of Presidential Proclamation 4074, the plaintiff submits that no consideration should be given thereto inasmuch as the Proclamation does not specifically refer to this Act as a part of its statutory authority.

To sustain the plaintiff's contention would be to place an unwarranted limitation upon judicial review. Presidential Proclamation 4074 does not seek to designate the Tariff Act of 1930, as amended, and the Trade Expansion Act of 1962 as the sole sources of authority. On the contrary, the Proclamation refers to the President as "acting under the authority vested in me by the Constitution and the statutes, including, but not limited to, the Tariff Act, and the TEA [Trade Expansion Act] * * *." This court, accordingly, has considered the argument presented by the defendant with respect to the authority that may have been delegated to the President by the provisions of the Trading with the Enemy Act. Toledo, P. & W. R. R. v. Stover, 60 F.Supp. 587 (S.D.Ill. 1945).

It has been long recognized that war, itself, effects a suspension of commercial intercourse between belligerent nations. However, changes in economic conditions as well as changes in the evolving philosophy of man have dictated that legislative modifications be enacted in lieu of the inflexible rule of law terminating all commercial intercourse between warring nations existing at common law and in the law of nations. In so doing, controls have been provided through legislative enactment with respect to authorized foreign trade and intercourse which prior thereto would have been prohibited.

The present Trading with the Enemy Act may be said to have its roots in the Act of Congress of July 13, 1861, 12 Stat. 255, 257.[7] Pursuant thereto the President through the Secretary of the Treasury, was authorized in his discretion to "license and permit commercial intercourse" with all or any part of the States in insurrection.

The system of licensing, thus first authorized during the Civil War, again became an integral part of the Trading with the Enemy Act of 1917. The provisions thereof prohibited any trade with the enemy "except with the license of the President." 40 Stat. 412, section 3(a).

It will be noted that in each of the foregoing legislative enactments the words "license" and "permit" were used to describe the form of regulation delegated to the President. From the congressional committee hearings,[8] reports[9]

---

7. Section 5 of the 1861 Act provided:
[A]ll commercial intercourse by and between the same and the citizens thereof and the citizens of the rest of the United States shall cease and be unlawful so long as such condition of hostility shall continue; and all goods and chattels, wares and merchandise, coming from said State or section into the other parts of the United States, and all proceeding to such State or section, by land or water, shall, together with the vessel or vehicle conveying the same, or conveying persons to or from such State or section, be forfeited to the United States: Provided, however, That the President may, in his discretion, license and permit commercial intercourse with any such part of said State or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such time, and by such persons, as he, in his discretion, may think most conducive to the public interest; and such intercourse, so far as by him licensed, shall be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury.

8. Hearings on H.R. 4704, House Comm. on Interstate and Foreign Commerce, 65th Cong., 1st Sess., May 29, 31 and June 4, 1917; Hearings on H.R. 4960, Senate Subcomm. of Comm. on Commerce, 65th Cong., 1st Sess., July 23, 24, 25, 27, 30 and August 2, 1917.

9. H.Rep.No.85, 65th Cong., 1st Sess., June 21, 1917; S.Rep.No.111, 65th Cong., 1st

and debates on the Trading with the Enemy Act of 1917,[10] as well as from the statement voiced by the Secretary of the Treasury,[11] it appeared, however, that the statutory provisions afore referred to did not provide sufficient authority to the President to adequately control imports—a power considered essential during a time of war. Therefore, the Congress, in enacting the Trading with the Enemy Act of 1917, added section 11 which gave broad and expansive powers to the President to control imports during World War I. 40 Stat. 422, section 11.[12]

The significance of the afore-quoted section, insofar as it relates to the immediate question presented to us for determination, is found in the fact that the extremely broad power given to the President thereunder to regulate imports terminated at the end of World War I and was never reenacted in subsequent amendments.[13]

In 1933 during the domestic crisis occasioned by the depression of that decade, the President's authority to act under section 5(b) was extended to "any other period of national emergency declared" by him, and he was given the power "by means of licenses or otherwise" to regulate "transfers of credit between or payments by banking institutions." 48 Stat. 1.

In 1941 the Act was amended in order to give the President more flexibility over alien property, 55 Stat. 839. Again, the mode of regulation authorized by the statute included a system of licenses.

In support of its contention the defendant places specific reliance on section 5(b) of the present Trading with the Enemy Act (50 U.S.C. App. § 5(b)) providing:

(b)(1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or

Sess., August 23, 1917; H.Rep.No.155, 65th Cong., 1st Sess., September 21, 1917.

10. 55 Cong.Rec., 65th Cong., 1st Sess., pp. 4840–4879, 4907–4930, 4968–4989, 6949–6958, 7007–7025 (1917).

11. Letter from Secretary William G. McAdoo to Senator Ransdell, dated September 11, 1917, 55 Cong.Rec., 65th Cong., 1st Sess., p. 7013. See also comments of Senators Reed and Ransdell, 55 Cong.Rec., pp. 7012–7014.

12. Section 11, above referred to, provided: Whenever during the present war the President shall find that the public safety so requires and shall make proclamation thereof it shall be unlawful to import into the United States from any country named in such proclamation any article or arti-

cles mentioned in such proclamation except at such time or times, and under such regulations or orders, and subject to such limitations and exceptions as the President shall prescribe, until otherwise ordered by the President or by Congress: *Provided, however,* That no preference shall be given to the ports of one State over those of another.

13. The license powers accorded to the President terminated at the close of World War I and became effective again automatically at the outbreak of World War II. On the other hand, section 11 and the broad powers included therein, were of a temporary nature and were terminated at the close of World War I. See Markham v. Cabell, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

\*　\*　\*　\*　\*　\*

Recognizing that a declaration of a national emergency is within the discretion of the President and that a determination as to the need or desirability of affirmatively exercising such authority is not a judicial function, this court will refrain from offering any gratuitous comment as to the existence or nonexistence of the national emergency declared in Presidential Proclamation 4074. Sardino v. Federal Reserve Bank of New York, 361 F.2d 106 (2d Cir. 1966); Werner v. United States, 119 F. Supp. 894 (S.D.Cal.1954), aff'd, 233 F. 2d 52 (9th Cir. 1956).

The plaintiff urges that the regulatory powers conferred upon the President by the Trading with the Enemy Act are directed against and applicable only to enemy countries and against property having an "enemy taint." Such a construction with respect to the purview of this Act is too restrictive. The statute relates to " \* \* \* any property in which any foreign country or a national thereof has any interest, \* \* \* ." The usage of the word "any" negates such a limited construction. The successive amendments to the Act likewise indicate the intent of the Congress to expand its scope rather than to narrow its application. United States v. Broverman, 180 F.Supp. 631 (S.D.N.Y.1959).

The gravamen of the defendant's contention appears to rest on the construction of the words contained in section 5(b)(1)(B), "\* \* \* regulate \* \* \* importation \* \* \* of \* \* \* any property in which any foreign country or a national thereof has any interest, \* \* \* ." Pointing with particularity to this statutory language, the defendant further contends that Congress has, in effect, delegated to the President the regulatory power inherent in and originating from its constitutional authority to regulate foreign commerce. Citing McGoldrick v. Gulf Oil Corp., 309 U.S. 414, 60 S.Ct. 664, 84 L. Ed. 840 (1940) as authority, the defendant argues that it necessarily follows that the imposition of the surcharge in the form of a supplemental duty is thus within the authority delegated to the President by section 5(b)(1)(B). We do not agree that the McGoldrick case or the decisions referred to therein justify the application of this reasoning to the case at bar.

In acknowledging the principle that the laying of duties on imports, although an exercise of the taxing power, is also an exercise of the power to regulate foreign commerce, Mr. Justice Stone in the McGoldrick case cites Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 88, 6 L.Ed. 23 (1824); Hampton & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L. Ed. 624 (1928) and Board of Trustees v. United States, 289 U.S. 48, 53 S.Ct. 509, 77 L.Ed. 1025 (1933). Each of these decisions affords us an incisive insight with respect to the relationship existing between the powers to tax and lay duties on imports and the power to regulate foreign commerce as conferred upon the Congress by the Constitution.

In the case of Gibbons v. Ogden, supra, Mr. Chief Justice Marshall stated:

We must first determine whether the act of laying "duties or imposts on imports or exports," is considered, in the constitution, as a branch of the taxing power, or of the power to regulate commerce. We think it very clear, that it is considered as a branch of the taxing power. It is so treated in the first clause of the 8th section: "Congress shall have power to lay and collect taxes, duties, imposts and excises;" and before commerce is mentioned, the rule by which the exercise of this power must be governed, is declared. It is, that all duties, imposts and excises shall be uniform. In a separate clause of the enumeration, the power to regulate commerce is

given, as being entirely distinct from the right to levy taxes and imposts, and as being a new power, not before conferred. The constitution, then, considers these powers as substantive, and distinct from each other; and so places them in the enumeration it contains. The power of imposing duties on imports is classed with the power to levy taxes, and that seems to be its natural place. \* \* \*

Again, in Hampton & Co. v. United States, the Supreme Court, in rejecting the contention that the sole constitutional purpose in providing the Congress with the power to impose customs duties was to raise revenue, stated (*supra*, 276 U.S. pp. 412–413, 48 S.Ct. p. 353):

> So long as the motive of Congress and the effect of its legislative action are to secure revenue for the benefit of the general government, the existence of other motives in the selection of the subjects of taxes cannot invalidate congressional action. As we said in the Child Labor Tax Case, 259 U.S. 20, 38, 42 S.Ct. 449, 451, 66 L.Ed. 817: "Taxes are occasionally imposed in the discretion of the Legislature on proper subjects with the primary motive of obtaining revenue from them, and with the incidental motive of discouraging them by making their continuance onerous. They do not lose their character as taxes because of the incidental motive." And so here, the fact that Congress declares that one of its motives in fixing the rates of duty is so to fix them that they shall encourage the industries of this country in the competition with producers in other countries in the sale of goods in this country, cannot invalidate a revenue act so framed. \* \* \*

Similarly, we find a further reiteration of the constitutional principle first enunciated in the case of Gibbons v. Ogden, *supra*, in the case of Board of Trustees v. United States, wherein the Supreme Court stated, *supra*, 289 U.S. p. 58, 53 S.Ct. p. 510:

It is true that the taxing power is a distinct power; that it is distinct from the power to regulate commerce. Gibbons v. Ogden, *supra*, p. 201, of 9 Wheat. It is also true that the taxing power embraces the power to lay duties. Art. I, § 8, cl. 1. But because the taxing power is a distinct power and embraces the power to lay duties, it does not follow that duties may not be imposed in the exercise of the power to regulate commerce. The contrary is well established. Gibbons v. Ogden, *supra*, p. 202. \* \* \*

From the foregoing decisions, it is well established that the constitutional grants of power to lay and collect taxes and duties on imports and the power to regulate foreign commerce are separate and independent grants of authority distinct from each other. Although the primary purpose of the power to tax and impose duties may be to obtain revenue, it may also serve as a regulatory measure.

Similarly, the imposition of a duty on imports may constitute, *inter alia,* an exercise of the constitutional power to regulate foreign commerce. In connection with this latter power, however, it must be borne in mind that the extent and mode of any regulatory authority delegated by the Congress must be determined in each individual instance by the statutory language and an examination of all the surrounding circumstances. It cannot be said that the investiture of a power to "regulate" necessarily includes, *per se,* the power to levy duties. The necessity of determining the scope and extent of any delegated regulatory power has been recognized by the Supreme Court in Hamilton v. Dillin, 88 U.S. (21 Wall.) 73, p. 92, 22 L.Ed. 528 (1875), wherein it was stated:

> [I]t is conceded that in many cases the power to make rules and regulations on a particular subject is a limited power, having respect to mode and form, and time and circumstance, and not to substance. But it must

also be conceded that in other cases the power is much more extensive and substantial. * * *

The decisions in the cases of Gibbons v. Ogden; Hampton & Co. v. United States; Board of Trustees v. United States and McGoldrick v. Gulf Oil Corp., *supra*, relate to the imposition of duties by the Congress as an exercise of its plenary constitutional powers to lay and collect taxes and duties and to regulate foreign commerce. The significance of the *McGoldrick* decision rests in its determination that a state regulation (tax) on imports, which previously had been the object of congressional regulatory attention, cannot infringe on the constitutional power vested in the Congress to regulate commerce. These issues, however, are not involved herein. The sole question before us in the case at bar concerns the extent to which the Congress has delegated the power of "regulation" to the Executive.

In determining whether section 5(b) of the Trading with the Enemy Act serves as authority for the imposition of an additional duty, we must accord the word "regulate" the sense in which the Congress intended it to be used. The meaning of a statute or of the words therein is not to be derived from any single section, but from all of the parts comprising the entirety and, in turn, from their relationship to the ultimate purpose sought to be attained. Nor can the Act be read intelligibly if the eye is closed to the purpose and objectives evidenced in complementary statutes or in the known temper of legislative intent or historical usage. For legislation delegating restrictive regulatory authority cannot operate, merely upon the declaration of an emergency, to the exclusion of other legislative acts providing procedures prescribed by the Congress for the accomplishment of the very purpose sought to be attained by Presidential Proclamation 4074. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

The words "instructions, licenses, or otherwise" contained in section 5(b)(1) define the nature and mode of the regulatory authority intended to be delegated to the President. These words conform to the phraseology used throughout the history of the Act in the establishment of a system of licenses and permits for the control of property during a time of war and crisis and which have come to be recognized as the hallmark and distinguishing feature of the Act. These words likewise serve to evidence a recognition on the part of the Congress that such delineating and restrictive phraseology, in fact, was employed in order to preclude the all-encompassing construction now urged by the defendant. If the words "regulate * * * importation" were given the construction contended by the defendant, the President by the declaration of a national emergency could determine and fix rates of duty at will, without regard to statutory rates prescribed by the Congress and without the benefit of standards or guidelines which must accompany any valid delegation of a constitutional power by the Congress. Hampton & Co. v. United States, *supra*, 276 U.S. p. 409, 48 S.Ct. 348, 72 L.Ed. 624. The delegation of such an unrestrained and unbridled authority to lay duties, indeed, might well be deemed an abdication by the Congress of its constitutional power to regulate foreign commerce.

In the case of Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), the Supreme Court, speaking through Mr. Chief Justice Hughes reaffirmed the principle that the Congress cannot abdicate its legislative powers, vested by the Constitution. In holding that section 9(c) of title I of the National Industrial Recovery Act of June 16, 1933 (15 U.S.C., title I, § 709(c)), which authorized the President to prohibit the transportation of petroleum in interstate commerce, constituted an unconstitutional delegation of legislative power, the Court stated:

[I]t gives to the President an unlimited authority to determine the policy

and to lay down the prohibition, or not to lay it down, as he may see fit. * * * [*Id.*, p. 415, 55 S.Ct. p. 246.]

Again, in referring to article I, section 1 of the Constitution, providing that all legislative powers therein granted shall be vested in the Congress, and to article I, section 8, paragraph 18, providing that the Congress is empowered to make all laws necessary and proper for the execution of its invested powers, the Court, in the *Panama Refining Co.* case, further stated (*supra,* p. 421, 55 S.Ct. p. 248):

> * * * The Congress manifestly is not permitted to abdicate or to transfer to others, the essential legislative functions with which it is thus vested. Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national Legislature cannot deal directly. The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility. But the constant recognition of the necessity and validity of such provisions, and the wide range of administrative authority which has been developed by means of them, cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained.

The Court added (*Id.*, p. 430, 55 S.Ct. p. 253):

> If section 9(c) were held valid, it would be idle to pretend that anything would be left of limitations upon the power of the Congress to delegate its law-making function. The reasoning of the many decisions we have reviewed would be made vacuous and their distinctions nugatory. Instead of performing its law-making function, the Congress could at will and as to such subjects as it chose transfer that function to the President or other officer or to an administrative body. The question is not of the intrinsic importance of the particular statute before us, but of the constitutional processes of legislation which are an essential part of our system of government.

 It is both the function and duty of the courts to hold the exercise of delegated congressional powers within the confines prescribed by the Congress. It is likewise well settled that a statute subject to two interpretations, should be construed so as to preserve its constitutionality. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

 Accordingly, we take the position that section 5(b)(1) of the Trading with the Enemy Act conveys to the President an authority consisting only of a specific mode of regulation, as distinguished from the full and all-inclusive power to regulate foreign commerce. The delegation of the specific regulatory authority, "by means of instructions, licenses, or otherwise," manifestly is restrictive in scope and is but one branch of many attached to the trunk of the tree in which is lodged the all-inclusive substantive power to regulate foreign commerce, vested solely in the Congress.

 We, therefore, conclude that section 5(b)(1) of the Act contains such restrictive standards and guidelines as to meet the test of constitutionality, but which, in turn, precludes the President from laying the supplemental duties provided by Presidential Proclamation 4074.

In support of its position, the defendant has placed reliance on the case of South Puerto Rico Sugar Co. Trading Corp. v. United States, 334 F.2d 622, 167 Ct.Cl. 236 (1964), cert. denied, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965). The question therein determined by the Court of Claims involved the validity of an "entry fee" charged to the plaintiff as a precondition to the importation of sugar into the United States from the Dominican Republic. The "entry fee" was imposed by the President through the Secretary of Agriculture pursuant to the specific authority provided by the Act of Congress of July 6, 1960, 74 Stat. 330. By the provisions of that Act, the President was authorized to reduce the quota of sugar imported from Cuba and, after so doing, permit the deficit caused by such a quota reduction to be imported and marketed in the United States, " * * * at such times and from such sources, * * * subject to such terms and conditions as he deems appropriate under the prevailing circumstances * * *."

In the detailed discussion of the foreign affairs existing at the time of the enactment of the congressional Act and the imposition of the "entry fee," the court in its majority opinion stressed with particularity the politically sensitive hemispheric conditions and events —the Castro Government in Cuba; the attempt on the life of the President of Venezuela concerning which the Trujillo Government in the Dominican Republic was alleged to be connected; the collective action taken by the Organization of American States (OAS) against the Dominican Republic in severing diplomatic relations and in the partial interruption of economic relations; the increase in the quantity of Dominican Republic sugar which automatically would be allowed to be exported to the United States by virtue of the reduction of the Cuban quota, a large percentage of which was owned by and operated for the benefit of General Trujillo and his family.

Recognizing the foregoing matters having great import on the political as well as the economic stability of many nations in the Western Hemisphere, the court gave great weight to the resulting responsibility falling upon the President in the administration of foreign affairs. Relating his singular discretion and authority in this area to the language contained in the Sugar Act, as amended on July 6, 1960, the court stated (334 F.2d, p. 632):

> Exercising his discretion in the light of the needs of United States foreign policy, the President (through his delegates) could lawfully deem it an "appropriate" "condition" of importation, "under the prevailing circumstances," to require a fee on "replacement" sugar from the Dominican Republic which would deprive the Trujillo regime of the special premium of the United States price (over the world price). * * *

It would appear clear that the majority opinion of the court in essence construed the "entry fee" not as a duty, but as a license exacted by the President, as a "condition," in the course of implementing this country's foreign policy and, thus, within the purpose and purview of the authority granted to the President by the specific statutory language of the Sugar Act, as amended.

The entry fee under consideration in the *South Puerto Rico Sugar* case was imposed as a sanction against the Dominican Republic. It was not imposed as a duty. We fail to find wherein a proper analogy can be drawn between the executive regulation imposing the "entry fee" directed against the Dominican Republic under the authority of the Sugar Act of 1960, and Presidential Proclamation 4074 imposing the 10 percent surcharge in the form of a "supplemental duty" uniformally on most articles imported into the United States.

The case of Hamilton v. Dillin, 88 U. S. (21 Wall.) 73, 22 L.Ed. 528 (1875) serves to well illustrate the distinction between the delegation to the Executive

by the Congress of an authority to "regulate" pursuant to its constitutional powers to lay and collect taxes and duties and to regulate foreign commerce, as distinguished from authority to regulate pursuant to the war power of government.

The question therein presented related to an Act of Congress enacted during the Civil War authorizing the President to prohibit all commercial intercourse between the Confederacy and the Union and "in his discretion, license and permit commercial intercourse" with any part of such States pursuant to rules and regulations prescribed by the Secretary of the Treasury.[14] The Court in upholding a charge of a license fee of four cents per pound imposed by the Secretary of the Treasury on the importation of cotton from States in insurrection stated (pp. 93–94):

> * * * When, in March, 1863, the President issued his license to trade in cotton and other articles in the insurrectionary districts, under and subject to the conditions contained in the regulations adopted by the Secretary of the Treasury, his action was not inconsistent with or repugnant to the internal revenue law passed the year before. It had nothing to do with that law or the subject-matter of it. The conditions exacted by him were not imposed in the exercise of the taxing power, but of the war power of the government. The exaction itself was not properly a tax, but a bonus required as a condition precedent for engaging in the trade. * * *

From the foregoing decision, it will be noted that the license fee in question was neither deemed a tax nor was its application deemed to have resulted from a delegation of the constitutional power of the Congress to regulate foreign commerce. As the Court stated, it was a "bonus required as a condition precedent for engaging in the trade." The specific delegation of authority and the resulting imposition of the license fee was in the exercise of the war power of government.

■ This court is not without appreciation of the burdensome problems encountered by the Executive as he represents these United States in the society of nations. Nor can the court fail to recognize the efforts of the President to achieve stability in the international trade position and monetary reserves of this country. But neither need nor national emergency will justify the exercise of a power by the Executive not inherent in his office nor delegated by the Congress. Expedience cannot justify the means by which a deserving and beneficial national result is accomplished. To indulge in judicial rationalization in order to sanction the exercise of a power where no power in fact exists is to strike the deadliest of blows to our Constitution.

The power to levy and collect taxes, duties, imposts and excises and to regulate foreign commerce has been vested solely in the Congress by the Constitution.

"The question whether such a delegation of legislative power is permitted by the Constitution is not answered by the argument that it should be assumed that the President has acted, and will act, for what he believes to be the public good. The point is not one of motives, but of constitutional authority, for which the best of motives is not a substitute." Panama Refining Co. v. Ryan, *supra*, 293 U.S. p. 420, 55 S.Ct. p. 248, 79 L.Ed. 446.

■ Notwithstanding the broad and expansive authority delegated by various congressional enactments to the Executive in the administration of our international trade relations and affairs, we are of the opinion that Presidential Proclamation 4074 in its attempt to unilaterally assess a surcharge in the form of a supplemental duty in the amount of

---

14. 12 Stat. 255, 257 is quoted in part in footnote 7, *supra*.

10 percent on imports entering this country, exceeded the authority delegated to the President and is, therefore, invalid.

The motion of the plaintiff for summary judgment is granted and the cross-motion of the defendant is denied.

Let judgment be entered accordingly.

MALETZ, Judge (concurring).

I am in accord with the well-reasoned opinion of Chief Judge Boe. Withal, I believe it may be helpful to add some further comments with respect to the defendant's contention that when a national emergency is declared by the President—as was done in Proclamation 4074—he has unlimited discretion to impose supplemental duties on imports by virtue of the authority delegated to him by section 5(b) of the Trading with the Enemy Act, as amended (50 U.S.C. App. § 5(b)). To the extent pertinent, that section provides:

> (b) (1) During the time of war or *during any other period of national emergency declared by the President, the President may,* through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, *by means of instructions, licenses, or otherwise—*
>
> (A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and
>
> (B) investigate, *regulate,* direct and compel, nullify, void, *prevent or prohibit,* any acquisition holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation *of,* or dealing

in, or exercising any right, power, or privilege with respect to, or transactions involving, *any property in which any foreign country or a national thereof has any interest,* by any person, or with respect to any property, subject to the jurisdiction of the United States; * * *; and *the President may, in the manner hereinabove provided, take other and further measures not inconsistent herewith for the enforcement of this subdivision.* [Emphasis added.]

> * * * * * *

At the outset, it is fundamental that the court's primary task, in determining whether section 5(b) authorizes the President to impose supplemental duties on imports, is to ascertain the Congressional intent and to construe the section in such a way as to give effect to that intent. This, in turn, requires the provision in issue to be reviewed, not as an isolated, discrete enactment, but in the context of the entire statute of which it is a part. United States v. California Portland Cement Company, 413 F.2d 161, 166 (9th Cir. 1969); Stanford v. Commissioner of Internal Revenue, 297 F.2d 298, 308 (9th Cir. 1961); Sun Theatre Corp. v. RKO Radio Pictures, Inc., 213 F.2d 284, 290 (7th Cir. 1954).

The Trading with the Enemy Act of 1917 (40 Stat. 411 et seq.) came into being as a consequence of the common law doctrine of both England and the United States that during a state of war all commercial intercourse between citizens of belligerent states or countries is prohibited unless specifically authorized by the sovereign.[1] Its declared purpose was "to mitigate the rules of law which prohibit all intercourse between the citizens of warring nations, and to permit, under careful safeguards and restrictions, certain kinds of business to be

1. See e. g., The Julia, 12 U.S. (8 Cranch) 181, 193, 3 L.Ed. 528 (1814); The Rapid, 12 U.S. (8 Cranch) 155, 161, 3 L.Ed. 520 (1814); Hanger v. Abbott, 73 U.S. (6 Wall.) 532, 535, 18 L.Ed. 939 (1868); Coppell v. Hall, 74 U.S. (7 Wall.) 542, 554, 19 L.Ed. 244 (1869); United States v. Lane, 75 U.S. (8 Wall.) 185, 195, 19 L.Ed. 445 (1869); Insurance Co. v. Davis, 95 U.S. 425, 429, 24 L.Ed. 453 (1877).

carried on."[2] This was accomplished by prohibiting and making unlawful all forms of trading with the enemy "except with the license of the President." 40 Stat. 412, sec. 3(a).

The concept of legalizing trade with the enemy pursuant to license was carried over from the Civil War when legislation was enacted providing for a system of licenses and permits for trading with the inhabitants of the insurrectionary States. Thus, section 5 of the Act of July 13, 1861 (12 Stat. 255, 257) authorized the President to declare the inhabitants of a State or part of a State to be in a state of insurrection; and provided that "thereupon all commercial intercourse" by and between the citizens of those areas and the rest of the United States "shall cease and be unlawful so long as such condition of hostility shall continue," and that all articles coming from or proceeding to such areas shall be forfeited to the United States, together with the vehicle or vessel conveying them, provided, however—

> [t]hat the President may, in his discretion, license and permit commercial

intercourse with any such part of said State or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such time, and by such persons, as he, in his discretion, may think most conducive to the public interest; and such intercourse, so far as by him licensed, shall be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury. * * *

Pursuant to this Act, President Lincoln licensed and permitted trading between the citizens of the Union and the inhabitants of the insurrectionary States which was carried on under rules and regulations issued by the Secretary of the Treasury.[3] What is particularly significant is that the licensing authority delegated to the President and Secretary of the Treasury under the 1861 Act and as carried out in the executive orders, proclamations and regulations issued pursuant thereto, was never construed *or even considered as including the power to impose taxes or duties.*[4]

2. S.Rep.No.111, 65th Cong., 1st Sess. (1917), p. 1. See also Ex Parte Kumezo Kawato, 317 U.S. 69, 76, 63 S.Ct. 115, 87 L.Ed. 58 (1942).

3. On August 16, 1861, the President issued a Proclamation (12 Stat. 1262) declaring that the inhabitants of certain States, with some exceptions, were in a state of insurrection; that all commercial intercourse with them was unlawful; and that all goods coming in from those States "without the special license and permission of the President, through the Secretary of the Treasury" would be forfeited to the United States. On February 28, 1862, the President issued an executive order licensing and permitting such commercial intercourse between the inhabitants of the areas declared to be in insurrection and the citizens of the States of the Union "within the rules and regulations which have been or may be prescribed by the Secretary of the Treasury for the conducting and carrying on of the same on the inland waters and ways of the United States." See Hamilton v. Dillin, 88 U.S. (21 Wall.) 73, 76, 22 L.Ed. 528 (1875). This was subsequently revised by the "License of Trade" issued by the President on March 31, 1863, permitting commercial intercourse with

inhabitants of the insurrectionary States pursuant to regulations adopted on that same date by the Secretary of the Treasury *and subsequently modified on September 11, 1863. Id.* at 77, 78. The following year, the licensing of commercial intercourse by private citizens with inhabitants of the insurrectionary areas was vastly circumscribed and restricted by sections 4, 8 and 9 of the Act of July 2, 1864 (13 Stat. 376 and 377). See United States v. Lane, 75 U.S. (8 Wall.) 185, 186–187, 19 L.Ed. 445 (1869).

4. In fact, the contrary position was taken by the Supreme Court in Hamilton v. Dillin, *supra*, 88 U.S. 73. There the appellant contended that a license fee required by Treasury Department regulations to be paid as a condition for obtaining a permit to purchase cotton in insurrectionary areas was illegally exacted on the ground that it was essentially a tax and, therefore, an improper exercise of Congress' power under the Constitution "to lay and collect taxes, duties, imposts and excises." *Id.* at 81. The Court, however, rejected this argument, holding that the license fee was not a tax imposed under the taxing power, but a "bonus" imposed under the war power of the government; that the power of the government to open and regu-

In sum, as explained by Charles Warren, Assistant Attorney General and author of the measure, the Trading with the Enemy Act of 1917—like the Act of July 13, 1861—"recognizes that there may be some kinds of business transactions or commercial intercourse between citizens of this country and enemies which may be carried on or performed with safety to the United States, and it provides for those transactions by means of a system of license."[5] Mr. Warren also observed that "[t]he provisions of * * * [the] bill greatly amplify and make more practical a system of license or permit which was provided for by the Government during the Civil War."[6] Thus, section 4 of the Act (40 Stat. 413, 414) contained elaborate provisions for control over branches or agencies of enemy corporations and enemy ally corporations doing business in this country, including insurance and reinsurance companies, under a procedure by which they could apply to the President for a "license to continue to do business."

Section 5(a) (40 Stat. 415) gave the President the power to issue (and suspend or revoke) licenses to do business with the enemy or its allies and to perform any act otherwise made unlawful by the Act without such license. Further, section 5(b) (*ibid*) authorized the President "by means of licenses or otherwise" to investigate, regulate or prohibit any transactions in foreign exchange, export, or earmarkings of coin, bullion, or currency, and evidence of transfers of indebtedness or ownership of property between the United States and any foreign country, whether enemy

---

late trade with the enemy was intended to be conferred upon the President and the Secretary of the Treasury in the Act of July 13, 1961; and that this included the power to impose such conditions as they saw fit, including payment of a license fee. The Court held (*id.* at 94 and 97):

> * * * The conditions exacted by him [the President] were not imposed in the exercise of the taxing power, but of the war power of the government. The exaction itself was not properly a tax, but a bonus required as a condition precedent for engaging in the trade. * * *
>
> * * * * *

It is hardly necessary, under the view we have taken of the character of the regulations in question, and of the charge or bonus objected to by the plaintiffs, to discuss the question of the constitutionality of the act of July 13th, 1861, regarded as authorizing such regulations. As before stated, the power of the government to impose such conditions upon commercial intercourse with an enemy in time of war as it sees fit, is undoubted. It is a power which every other government in the world claims and exercises, and which belongs to the government of the United States as incident to the power to declare war and to carry it on to a successful termination. We regard the regulations in question as nothing more than the exercise of this power. It does not *belong to the same category as the power to levy and collect taxes, duties, and excises.* It belongs to the war powers of the government, just as much so as the power to

levy military contributions, or to perform any other belligerent act. [Emphasis added.]

5. Testimony of Mr. Warren at Hearings on H.R. 4704 (the Trading with the Enemy bill) Before the House Comm. on Interstate and Foreign Commerce, 65th Cong., 1st Sess. (1917), p. 32.

6. Testimony of Mr. Warren at Hearings on H.R. 4960 (the Trading with the Enemy bill that was subsequently enacted) Before a Subcomm. of the Senate Comm. on Commerce, 65th Cong., 1st Sess. (1917), p. 131. See also testimony of the General Counsel of the Federal Reserve Board, *id.* at pp. 196–216; 55 Cong.Rec. 4852–4857 and 4862–4863 (1917). The Senate Commerce Committee in reporting out H.R. 4960 noted that the bill was susceptible of division into four portions. Thus, the Committee stated (S.Rep.No.111, 65th Cong., 1st Sess. (1917), p. 3):

> The first portion defines the word "enemy" and prescribes the acts which shall be forbidden and which are made criminal if performed without license.
>
> The second portion provides for a system by which any act otherwise unlawful and criminal may be licensed * * * if compatible with the safety of the United States and the successful prosecution of the war.
>
> The third portion deals with the conservation and utilization of enemy property during the war.
>
> The fourth portion deals with the entirely separable question of patents.

or neutral, or between residents of one or more foreign countries and any person in the United States.

More particularly, section 5 provided as follows (40 Stat. 415):

(a) That the President, if he shall find it compatible with the safety of the United States and with the successful prosecution of the war, may, by proclamation, suspend the provisions of this Act so far as they apply to an ally of enemy, and he may revoke or renew such suspension from time to time; and the President may grant licenses, special or general, temporary or otherwise, and for such period of time and containing such provisions and conditions as he shall prescribe, to any person or class of persons to do business as provided in subsection (a) of section four hereof, and to perform any act made unlawful without such license in section three hereof, and to file and prosecute applications under subsection (b) of section ten hereof; and he may revoke or renew such licenses from time to time, if he shall be of opinion that such grant or revocation or renewal shall be compatible with the safety of the United States and with the successful prosecution of the war; and he may make such rules and regulations, not inconsistent with law, as may be necessary and proper to carry out the provisions of this Act; and the President may exercise any power or authority conferred by this Act through such officer or officers as he shall direct.

If the President shall have reasonable cause to believe that any act is about to be performed in violation of section three hereof he shall have authority to order the postponement of the performance of such act for a period not exceeding ninety days, pending investigation of the facts by him.

(b) That the President may investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, export or earmarkings of gold or silver coin or bullion or currency, transfers of credit in any form (other than credits relating solely to transactions to be executed wholly within the United States), and transfers of evidences of indebtedness or of the ownership of property between the United States and any foreign country, whether enemy, ally of enemy or otherwise, or between residents of one or more foreign countries, by any person within the United States; and he may require any such person engaged in any such transaction to furnish, under oath, complete information relative thereto, including the production of any books of account, contracts, letters or other papers, in connection therewith in the custody or control of such person, either before or after such transaction is completed.

Against this background of which Congress was well aware, as evidenced from the Congressional committee hearings, reports and debates in both Houses on the bill,[7] it is clear that section 5 of the Trading with the Enemy Act of 1917 was a revitalization, albeit in more elaborate form, of the licensing provisions of section 5 of the Act of July 13, 1861; that it conferred upon the President the same kind of regulatory licensing authority that was granted the President and Secretary of the Treasury in the 1861 Act; and that this authority was to be exercised not only over trade with the enemy (section 5(a)), but over credit transfers, foreign exchange transactions, exports of precious metals and transfers of evidences of indebtedness or ownership of property between the United States and any foreign country (section 5(b)). It is equally clear that this licensing authority was not intended to be a grant of Congress' power to impose

7. The Congressional hearings, reports and debates thus referred to are cited in footnotes 8, 9, and 10, respectively, of Chief Judge Boe's opinion.

taxes or levy duties on imports. Hamilton v. Dillin, *supra,* 88 U.S. 73.

Indeed, grave concern was expressed by the Secretary of the Treasury over the fact that the Trading with the Enemy bill as approved by the House (H.R. 4960) did not provide for adequate Presidential control over imports, an omission he considered to be serious. Thus the Secretary explained: [8]

> \* \* \* It may be necessary to regulate the importation of nonessentials of commerce in order to prevent any adverse and objectionable balance of trade involving settlement in gold. Through governmental control of imports it will also be possible to insure the most efficient employment of certain imported raw materials essential to the effective prosecution of the war. It is probable that in the adjustment of trade relations, now so profoundly affected by war conditions, better results could be obtained than are now possible if the Government had control of these matters when dealing with governments that have imposed restrictions upon the exports of raw materials needed by our war industries.

The Senate, upon being apprised of the Secretary's views, approved a recommendation to add to H.R. 4960 a new section 11. This new section, which was subsequently agreed to by the House, provided (40 Stat. 422, 423):

> Whenever during the present war the President shall find that the public safety so requires and shall make proclamation thereof it shall be unlawful to import into the United States from any country named in such proclamation any article or articles mentioned in such proclamation except at such time or times, and under such regulations or orders, and subject to such limitations and exceptions as the President shall prescribe, until otherwise ordered by the President or by Congress: *Provided, however,* That no preference shall be given to the ports of one State over those of another.

It is important to note that this broad power over imports conferred upon the President—who could allow their entry into this country "under such regulations or orders, and subject to such limitations and exceptions" as he might prescribe—was not a part of the licensing provisions of the 1917 Trading with the Enemy Act; rather, it was included as a temporary wartime measure which, by its very language remained in effect only "during the present war" [9] and terminated at the close of that conflict.[10] Moreover, it is significant that section 11, which delegated to the President such broad authority over imports, was never reenacted or even proposed for passage in the course of subsequent amendments to the Trading with the Enemy Act.

Section 5 on the other hand was constructed in terms of permanent legislation; accordingly, subsection (a) thereof automatically went into effect again at the outbreak of World War II. See Markham v. Cabell, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). Subsection (b), however, by virtue of subsequent amendment, became no longer limited in its application solely to periods of conflict. In this connection, on March 9, 1933, in order to deal with the domestic banking emergency, the President's au-

---

8. Letter from Treasury Secretary William G. McAdoo to Senator Ransdell, dated Sept. 11, 1917, 55 Cong.Rec. 7013 (1917).

9. Sections 3(d), 4(b), 13 and 14 of the Trading with the Enemy Act of 1917, which also referred to the "present war," similarly terminated at the conclusion of World War I.

10. There was one exception to the termination of section 11, which exception was ef-

fected by the enactment on November 19, 1919 of H.J.Res. 269 (41 Stat. 361). That statute provided that "notwithstanding the prior termination of the present war," the provisions of the Trading with the Enemy Act and of any Presidential Proclamation issued pursuant thereto which prohibited or controlled the importation of dyes and other products derived from coal tar were to be continued to January 15, 1920.

thority to act under section 5(b) was extended to any "period of national emergency declared" by him, and he was given the power to regulate "by means of licenses or otherwise * * * transfers of credit between or payments by banking institutions." 48 Stat. 1.[11]

On May 7, 1940, Congress by Joint Resolution (54 Stat. 179) (1) authorized the President, under section 5(b), "by means of licenses or otherwise," to regulate transactions in stocks and securities in which any foreign country or national had an interest; and (2) confirmed an Executive Order of April 10, 1940 and regulations issued thereunder restricting all transactions and transfers of credit in which Norway and Denmark (which had been invaded by Germany) or their nationals had an interest.[12]

Section 5(b) was last amended on December 18, 1941, by section 301 of the First War Powers Act of 1941 (55 Stat. 839) in order to give the President more comprehensive control over the seizure, vesting and disposition of all property of any foreign country or national.[13] To accomplish this purpose, the President was authorized, among other things, to regulate "by means of *instructions,* licenses, or otherwise * * * any acquisition holding, withholding, use, transfer, withdrawal, transportation, *im-portation* or exportation * * * involving, any property in which any foreign country or a national thereof has any interest * * *."[14] As summed up by Representative Kefauver on the House floor (87 Cong.Rec. 9865 (1941)):

It was explained to us by representatives of the Treasury that it was absolutely necessary for the present act —5(b)—to be reenacted in order to enable the Treasury to carry out its policy of freezing certain credits and of handling certain financial interests during the war. The explanation made to us, and I think it is carried out in this bill, is that the only change the Treasury wanted in 5(b) of the Trading With the Enemy Act was to give the executive department power not only to passively freeze credits and to negatively handle the operation of some manufacturing plants by a system of licenses or controls that they have to work under at the present time, but also to give the President the power to actively put into operation those interests or those securities or plants that might be taken over and be seized under authority of 5(b) of the present act.

Thus it can be seen that the amendments to section 5(b) successively ex-

---

11. Prior thereto, on September 24, 1918, the President was authorized under section 5(b) to regulate or prohibit "by means of licenses or otherwise" the hoarding or melting of gold or silver coin, bullion or currency, and to regulate (until two years after "the termination of the present war") any transactions in bonds and certificates of indebtedness of the United States. 40 Stat. 966.

12. See H.Rep.No.2009, 76th Cong., 3rd Sess. (1940), pp. 1–2. In 1941, the House Judiciary Committee pointed out that under the system of property control authorized by the 1940 amendment, "the Government exercises supervision over transactions in foreign property, either by prohibiting such transactions *or by permitting them on condition and under license."* [Emphasis added.] H.Rep. No.1507, 77th Cong., 1st Sess. (1941), pp. 2–3.

13. See H.Rep.No.1507, *supra,* note 12. See also S.Rep.No.911, 77th Cong., 1st Sess. (1941), p. 2. With these added powers, the President could "reach enemy interests which masqueraded under * * * innocent fronts." Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 485, 68 S.Ct. 174, 92 L.Ed. 88 (1947). On the effect of the 1941 amendment with respect to licensing foreign trade and credit transfers, see Reeves, The Control of Foreign Funds by the United States Treasury, 11 Law & Contemp.Prob. 17, 32 et seq. (1945–46).

14. The words "instructions" and "importation" were added to section 5(b) by the foregoing 1941 amendment. However, there is no indication in the legislative history of this amendment as to the reason for the inclusion of these specific words.

tended the President's licensing authority in the areas of foreign exchange, banking and currency transactions and transactions involving property in which foreign countries or nationals have an interest.[15] However, nowhere in the Congressional debates, committee hearings or reports on section 5(b) and the amendments thereto is there even a glimmer of a suggestion that Congress ever intended—or even considered—this section as a vehicle for delegating any of its tariff-making authority.

Furthermore, a finding that the President has the power under section 5(b) to impose whatever tariff rates he deems desirable simply by declaring a national emergency would not only render our trade agreements program nugatory, it would subvert the manifest Congressional intent to maintain control over its Constitutional powers to levy tariffs. The fact is that Congress has never lightly delegated its authority in this area and any delegation of such power has been—with the exception of section 11, the temporary wartime provision of the Trading with the Enemy Act —specific and restricted in its operation.

15. For an example of regulations which license or authorize transactions subject to executive control under section 5(b) upon declaration of a national emergency, see the Foreign Assets Control Regulations, as amended, 31 CFR Part 500 (1973). These regulations were first published by the Secretary of the Treasury (to whom the President had delegated the powers conferred upon him by section 5(b), 7 F.R. 1409, February 12, 1942) on December 19, 1950 (15 F.R. 9040) under the national emergency proclaimed by President Truman on December 16, 1950, 64 Stat. A454, which has never been revoked.

Section 500.201 of these regulations as amended, provides in pertinent part:

(a) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if either such transactions are by, or on behalf of, or pursuant to the direction of any designated foreign country, or any national thereof, or such transactions involve property in which any designated foreign country, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

(1) All transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States;

(2) All transactions in foreign exchange by any person within the United States; and

(3) The exportation or withdrawal from the United States of gold or silver coin or bullion, currency or securities, or the earmarking of any such property by any person within the United States.

(b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any designated foreign country, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

(1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States; and

(2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States.

(c) Any transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions set forth in paragraphs (a) or (b) of this section is hereby prohibited.

\* \* \* \* \*

Another example of the exercise under section 5(b) of Presidential authority to regulate international financial transactions is the Foreign Direct Investment Program established pursuant to Executive Order 11387 which was issued on January 1, 1968 (33 F. R. 47) on the basis of the continuing national emergency declared by President Truman in 1950. This program restricts transfers of capital to foreign countries by investors in the United States and requires repatria-

Thus, our foreign trade agreement program, commencing with the Reciprocal Trade Agreements Act of 1934 (48 Stat. 943), the subsequent amendments thereto, and culminating in the Trade Expansion Act of 1962 (76 Stat. 872), has gradually expanded the authority of the President, in negotiating trade agreements, to modify, increase or reduce duties; however, this authority has always been subject to various restrictions and limitations.[16]

In fact, the legislative history of the trade agreement statutes is enlightening in connection with defendant's claim of

authority under the Trading with the Enemy Act. For during the entire course of the Congressional committee hearings,[17] reports,[18] and debates on the trade agreement statutes, it was never once suggested that the President already possessed emergency rate-making authority, either under the Trading with the Enemy Act or any other statute. Rather, it was frequently emphasized that the President was being given new power to impose tariffs.[19]

Furthermore, as Chief Judge Boe observed in his analysis of the Trade Expansion Act of 1962, Congress' refusal

tion to this country by such investors of portions of their foreign earnings and short-term financial assets held abroad.

16. For example, even section 252(a)(3) of the Trade Expansion Act of 1962 (19 U.S.C. § 1882(a)(3)), which gives the President substantial tariff-making authority is operative only under clearly defined conditions. It authorizes the President to impose duties or other import restrictions "to the extent he deems necessary and appropriate" on the products of any foreign country or instrumentality, but only in the event that such foreign country or instrumentality establishes or maintains unjustifiable foreign import restrictions against United States agricultural products which impair the value of tariff commitments made to the United States, oppress United States commerce, or prevent the expansion of trade on a mutually advantageous basis. Furthermore, he must first provide an opportunity for the presentation of views concerning such foreign import restrictions which are maintained against United States commerce and, upon request by any interested person, provide for appropriate public hearings. 19 U.S.C. § 1882(d).

17. See Hearings on H.R. 8430 Before the House Comm. on Ways and Means, 73d Cong., 2d Sess. (1934); Hearings on H.R. 8687 Before the Senate Comm. on Finance, 73d Cong., 2d Sess. (1934); Hearings on H.R. 9900 Before the House Comm. on Ways and Means, 87th Cong., 2d Sess. (1962); Hearings on H.R. 11970 Before the Senate Comm. on Finance, 87th Cong., 2d Sess. (1962).

18. See H.Rep.No.1000, 73d Cong., 2d Sess. (1934); S.Rep.No.871, 73d Cong., 2d Sess. (1934); H.Rep.No.1818, 87th Cong., 2d Sess. (1962); S.Rep.No.2059, 87th Cong., 2d Sess. (1962); Conf.Rep.No.2518, 87th Cong., 2d Sess. (1962).

19. See, for example, the following Congressional comments on H.R. 11970, which was subsequently enacted as the Trade Expansion Act of 1962:

Rep. Brown. * * * I do not care which President may be in office, because I have opposed some of those things under a Republican administration just as I am against this proposal now to give the President of the United States unlimited powers in the field of trade tariffs, and import duties such as have never been exercised by any President in the past, have never been granted to any President. * * * 108 Cong.Rec. 11912 (1962).

\* \* \* \* \*

Sen. Curtis. * * * The pending bill represents the greatest delegation of power that has ever been given to any President. Heretofore our trade agreements have prevented a negotiation of 50 percent of the tariffs. This bill authorizes the President to wipe out the tariffs. It also authorizes him to impose tariffs even on goods that are not dutiable at the present time. Id. at 19756.

\* \* \* \* \*

Sen. Humphrey. With regard to the first —the new authority which this act would delegate to the President: There are those who charge that the Trade Expansion Act would result in the full and complete abandonment of the constitutional authority of Congress to regulate tariffs. This act would do nothing of the kind. What it does is to continue for a limited fixed period the delegation of authority to set tariff rates within limits defined by Congress and with well-established safeguards that has [sic] been in effect since 1934. * * * [Emphasis added.] Id. at 19867.

to accede to the Senate's proposal to insert a new provision (section 353) giving the President carte blanche authority to increase existing duties or impose new ones whenever he deemed it in the national interest, is a reflection of its firm stand against such unfettered and unrestricted delegation of its tariff-making authority to the President.

For all the foregoing reasons, it must be concluded that the regulatory licensing power delegated to the President by section 5(b) of the Trading with the Enemy Act does not include the authority to assess the 10 percent import surcharge here in question.

RE, Judge (concurring).

The pertinent legislative delegations of power do not authorize the President to assess the "surcharge in the form of a supplemental duty" prescribed in Presidential Proclamation 4074. Since the imposition of the surcharge is therefore *ultra vires,* I concur in the result which grants plaintiff's motion for summary judgment.